**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

VICTOR H. KOHRING,
    *Defendant-Appellant.*

No. 08-30170

D.C. No.
3:07-cr-00055-
JWS-1

OPINION

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued October 6, 2010
Submitted March 11, 2011
Seattle, Washington

Filed March 11, 2011

Before: Betty B. Fletcher, A. Wallace Tashima and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas;
Partial Concurrence and Partial Dissent by
Judge B. Fletcher

## COUNSEL

Michael Filipovic; Assistant Federal Public Defender; Seattle, Washington, for the appellant.

Kevin R. Gingras; United States Department of Justice; Washington, D.C., for the appellee.

## OPINION

THOMAS, Circuit Judge:

Victor Kohring filed this appeal after being convicted of three public corruption charges. While the case was pending

on appeal, we remanded it to the district court for the limited purpose of determining whether the government had breached its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), and, if so, the remedy to which Kohring is entitled. The district court determined the prosecution had failed to disclose favorable evidence to Kohring, but it concluded the government did not violate *Brady/Giglio* because the newly-disclosed information is not material. We agree with the district court that the prosecution suppressed favorable material, but we respectfully disagree with its conclusion as to materiality. We conclude that the newly-disclosed information, when viewed collectively, is material and that the prosecution violated *Brady/Giglio*. We vacate Kohring's conviction and remand to the district court for a new trial.

I

Victor Kohring, a former member of the Alaska State House of Representatives, was convicted in federal district court on three counts of public corruption felonies: conspiracy to commit extortion and attempted extortion under color of official right and bribery under 18 U.S.C. § 371 (Count 1), attempted interference with commerce by extortion induced under color of official right in violation of 18 U.S.C. § 1951(a) (Count 3), and bribery concerning programs receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B) (Count 4). Kohring was acquitted of Count 2—interference with commerce by extortion induced under color of official right in violation of 18 U.S.C. § 1951(a).

Kohring was charged after a federal investigation suggested he had accepted several cash payments and other benefits from Bill Allen in exchange for various legislative acts benefitting VECO Corporation, Allen's oil field services company that had interests in the construction of a natural gas pipeline in Alaska. The evidence tended to show a lengthy, ongoing relationship between Allen and Kohring, but most of the evi-

dence presented at trial related to transactions in 2006, during or near in time to Alaska's state legislative session in Juneau. Many of these transactions were documented in surreptitious audio and video recordings.

A

The government's case against Kohring consisted primarily of (1) recorded conversations between Kohring, Allen, and Rick Smith, another VECO executive; (2) testimony of Allen and Smith, who both reached plea agreements in exchange for their cooperation; and (3) the testimony of an FBI agent concerning statements Kohring made when his office was searched.

In a February 21, 2006, recorded telephone conversation between Smith and Kohring, the two discussed how the recently introduced Petroleum Production Tax bill would further VECO's interest in the development of a natural gas pipeline. The bill, while helpful to VECO, was contrary to Kohring's anti-tax philosophy. The two agreed to meet with Allen over dinner at the Island Pub restaurant on February 23, 2006, presumably to discuss matters further. A recorded conversation from March 4, 2006, between Allen and Smith, suggested that Allen had paid Kohring $1,000 at the Island Pub dinner.

A surreptitious video recording from March 30, 2006, captured a meeting between Kohring, Allen, and Smith in "Suite 604," a room in a local hotel that VECO rented during legislative sessions. The video recording captured three transactions —(1) Kohring asking Allen for help with a $17,000 credit card debt, (2) Allen giving Kohring money to "put in Easter eggs for his daughter," and (3) Allen paying Kohring money "for his daughter's Girl Scout uniform."

Kohring began that meeting by asking Allen "how [Kohring] could deal with" his $17,000 credit card debt. Kohring

explained that he accumulated the debt on account of medical bills and had been unable to pay it off with only his legislative salary. He told Allen and Smith he had "a situation . . . it's a financial matter" that he thought "potentially, could hurt [him] politically" and "[would] be a public record." He asked Allen and Smith if they "would . . . consider helping [him] and suggest some options to [him] as to what could be done." Allen did not give Kohring money at that time, but he assured Kohring that he would see what he could do. Kohring responded, "I wanna do everything . . . completely above board, of course." Indeed, he told Allen and Smith that he would pose "hypothetical questions" regarding any assistance to the ethics committee advisor for the Legislature. Allen responded, "I don't know if that's real smart . . . . I wouldn't even say to anybody that you're in a bind." Kohring demurred. At the end of their meeting, Kohring asked, "What can I do at this point to help you guys? Any—anything? . . . Just keep lobbying my colleagues for a governor's, ah, plan, right?"

At the same Suite 604 meeting, Allen gave Kohring money ostensibly (1) to put in his daughter's Easter eggs and (2) for his daughter's Girl Scout uniform. The video recording shows Allen asking Kohring when he was taking off for the Easter holiday and then telling Kohring how he used to put money in Easter eggs for children to find. Allen then reached into his wallet for cash to give to Kohring and asked Smith, "Have you got any hundreds? . . . [G]ive me a hundred." Kohring then told Allen the $50 he sent his daughter for her Girl Scout uniform "was a little short" and that "[s]he'll need about a hundred." Allen handed Kohring more cash. The video recording did not capture the amount of money transacted. Kohring testified at trial that he received only "around $100" at the meeting. Allen, though, testified he paid Kohring between $700-$1,100 at the meeting. Smith said Kohring received as much as $1,000, but he could only approximate because he did not know for sure how much was given.

The government also introduced evidence that on June 8, 2006—the final day of the special legislative session for passing the Petroleum Production Tax—Allen called Kohring to arrange a meeting at a local McDonald's restaurant. Allen testified at trial that he met Kohring at the restaurant, they walked back to Suite 604, and, while they were outside the hotel, Allen gave Kohring $600-$700. The government tied this testimony to another Suite 604 recording where Kohring told Allen he would have left town to prevent a vote on the Pipeline Production Tax if Allen had wanted him to do so.

B

At trial, the district court instructed the jury on the elements of each count and the time frames alleged in the government's Superceding Indictment. But neither the instructions nor the general verdict forms made specific reference to any of the acts alleged or connected specific acts to the individual counts. Kohring was convicted on conspiracy to commit extortion (Counts 1), attempted extortion (Count 3), and bribery (Count 4) but acquitted of extortion (Count 2). No special interrogatories were provided to the jury as part of the verdict form, and the trial court denied Kohring's request to interview the jury.

Kohring initially appealed his convictions on grounds not relevant here. Meanwhile, essentially the same prosecution team that was prosecuting Kohring was also prosecuting Senator Ted Stevens in Washington, D.C., on public corruption charges. *See United States v. Stevens*, Criminal Case No. 08-231 (D. D.C.). The government prosecuted Senator Stevens because he failed to disclose gifts he had received from Allen, as required by the Ethics in Government Act, *see* 5 U.S.C. App'x 4 §§ 101-505. Senator Stevens was convicted on several counts. After his conviction, though, it became apparent that the prosecution team had failed to provide Senator Stevens' with favorable discovery pertaining to a key witness—Bill Allen. A new group of government lawyers reviewed the

matter, and they moved to dismiss all charges against Senator Stevens with prejudice, based on the undisclosed *Brady/Giglio* material.

After Senator Stevens' charges were dismissed, Kohring moved us to order the government to disclose, under *Brady/Giglio*, all evidence "favorable to the accused." *Brady*, 373 U.S. at 87. The government then moved us to remand the matter to the district court for further proceedings under *Brady/Giglio*. We ordered Kohring released pending appeal and remanded the matter to the district court for the limited purpose of determining whether the government had breached its obligation of full disclosure under *Brady/Giglio* and, if so, whether Kohring was prejudiced and entitled to a remedy.

C

On remand, the government disclosed, for the first time, several thousand pages of documents, including "FBI 302 reports," undated and dated handwritten notes from interviews with Allen and Smith, e-mails, various memoranda, and police reports.

After receiving the material, Kohring moved the district court to dismiss the Superceding Indictment or, alternatively, order a new trial. Kohring alleged *Brady*/*Giglio* violations, based on the prosecution's failure to disclose the information, and violations of *Napue v. Illinois*, 360 U.S. 264 (1959), based on the prosecution's purported solicitation of false testimony from Allen and Smith. Specifically, Kohring claimed the newly-disclosed information included: (1) evidence that Allen had been or was still being investigated for sexual misconduct with minors, (2) evidence that cast doubt on Allen's memory and the amount of money paid to Kohring, (3) evidence that the payments were made out of friendship and pity rather than a corrupt *quid-pro-quo* relationship, (4) evidence of inconsistent statements made by Smith, as well as a questionable relationship he had with an investigating FBI agent,

and (6) evidence that a government witness thought Kohring was not corrupt.

The district court denied Kohring's motion for dismissal or a new trial, but it observed the material was favorable to Kohring and, indeed, had been suppressed. The district court nonetheless concluded the suppression did not amount to a *Brady/Giglio* violation because the suppression did not prejudice Kohring. The court reached this conclusion by reasoning that the newly-disclosed information did not cast any doubt on the evidence of Kohring's alleged $17,000 solicitation in the hotel room, which the court assumed supported the convictions on conspiracy to commit extortion (Counts 1), attempted extortion (Count 3), and bribery (Count 4). Thus, the withheld evidence, which tended to cast doubt on the remaining payments was immaterial. The district court noted in passing, though, that if Kohring had been convicted of extortion (Count 2)—which was charged on the basis of payments other than the $17,000 solicitation—then the newly-disclosed information would have undermined confidence in the guilty verdict.

Kohring also moved the district court for an evidentiary hearing on the newly-disclosed information, but the district court denied that motion, as well.

On appeal, Kohring challenges the district court's denial of his motion to dismiss the Superceding Indictment or, alternatively, for a new trial or evidentiary hearing. We have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court's *Brady/Giglio* determinations and all other questions of law. *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010); *Jackson v. Brown*, 513 F.3d 1057, 1069 (9th Cir. 2008).

## II

There is no doubt, as the district court properly held, that the prosecution withheld and suppressed information that was

favorable to the defense. Because Kohring was prejudiced by the suppression, we must vacate Kohring's conviction and remand the case for a new trial.

**[1]** In *Brady*, the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *Giglio*, the Supreme Court extended this principle to include evidence that impeaches a witness's credibility. 405 U.S. at 154.

**[2]** There are three elements of a *Brady/Giglio* violation: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Williams*, 547 F.3d 1187, 1202 (9th Cir. 2008) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (internal quotation marks omitted)).

**[3]** Evidence is prejudicial or material[1] "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). There is a "reasonable probability" of prejudice when suppression of evidence "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citing *Bagley*, 473 U.S. at 678). But a "reasonable probability" may be found "even where the remaining evidence would have been sufficient to convict the defendant." *Jackson*, 513 F.3d at 1071 (citing *Strickler*, 527 U.S. at 290).

**[4]** Suppressed evidence is considered "collectively, not item by item." *Kyles*, 514 U.S. at 436. If a reviewing court

---

[1]For the purpose of *Brady/Giglio*, "material" and "prejudicial" have the same meaning. *Been v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002).

finds a material *Brady/Giglio* violation, "there is no need for further harmless-error review." *Id.* at 435. But if suppressed evidence is "merely cumulative," then the failure to disclose is not a violation. *Morris v. Ylst*, 447 F.3d 735, 741 (9th Cir. 2006).

**[5]** We disagree with the government's argument that the newly-disclosed information is irrelevant. The government maintains the newly-disclosed information casts no doubt on the video-recorded evidence of the alleged $17,000 solicitation and that the alleged solicitation alone was sufficient to support convictions on all three counts. Contrary to the government's argument, there is no way to determine whether the jury based all three convictions on the alleged $17,000 solicitation. The jury was given only a general verdict form.[2] The jury was not instructed as to the specific alleged acts that supported each count. Nor was it provided with a copy of the Superceding Indictment, which connected specific allegetions to each count. The jury was instructed as to the time frame for each count,[3] but the government alleged that multiple acts occurred during those time frames, not just the alleged

---

[2] We have encountered similar problems with general verdicts. *See United States v. Manarite*, 44 F.3d 1407, 1413-14 (9th Cir. 1995). There, we reversed a conspiracy conviction after reversing a conviction on mail and wire fraud, which, along with other substantive charges, were alleged objects of the conspiracy. *Id.* Because the jury used only a general verdict, we could not determine what object the conspiracy conviction was based on. *Id.* We reversed the conspiracy conviction because it was possible that the conviction was based solely on the mail and wire fraud, which we had reversed. *Id.* We reasoned, "[I]f the judge instructs the jury that it need find only one of the multiple objects, and the reviewing court holds any of the supporting counts legally insufficient, the conspiracy count also fails." *Id.* at 1413 (citing *United States v. DeLuca*, 692 F.2d 1277, 1281 (9th Cir. 1982)). Otherwise, the defendant might have been convicted of conspiring to commit an act that was not a crime.

[3] The time frames for the counts were: conspiracy to commit extortion (Count 1)—January 2002 to August 2006; extortion (Count 2) —January 2006 to August 2006; attempted extortion—March 2006 to August 2006; and bribery—January 2006 to August 2006.

$17,000 solicitation. And, while the prosecutor referenced the alleged solicitation during closing arguments in connection with the attempted extortion count (Count 3) that alone does not imply the jury necessarily based its convictions on the alleged solicitation. In short, the newly-disclosed information is not irrelevant because it speaks to the acts that the jury might have relied on in reaching its verdicts (including the alleged $17,000 solicitation).

Beyond being merely relevant to the acts, Kohring alleges the newly-disclosed information is either exculpatory or could have been used to impeach government witnesses. Specifically, he claims the newly-disclosed information includes: (1) evidence that Allen had been or was still being investigated for sexual misconduct with minors, (2) evidence that casts doubt on Allen's memory and the amount of money paid to Kohring, (3) evidence that the payments were made out of friendship and pity rather than a corrupt *quid-pro-quo* relationship, (4) evidence of inconsistent statements made by Smith, as well as a questionable relationship he had with an investigating FBI agent, and (6) evidence that a government witness thought Kohring was not corrupt.

### A

*Brady/Giglio* claims are evaluated collectively, but we "must first evaluate the tendency and force of each item of suppressed evidence and then evaluate its cumulative effect at the end of the discussion." *Barker v. Flemming*, 423 F.3d 1085, 1094 (9th Cir. 2005) (quoting *Kyles*, 514 U.S. at 436).

### 1

[6] The newly-disclosed information contains Anchorage Police Department ("ADP") files alleging that Allen sexually exploited minors and attempted to conceal that behavior by soliciting perjury from the minors and arranging for one of the minors to make herself unavailable to testify against Allen.

These documents confirm the existence of an extensive investigation (dating back to at least 2004) into Allen's alleged sexual misconduct. The documents further establish that the prosecution was aware of the ADP investigation before Kohring's trial. In fact, one of the Assistant U.S. Attorneys prosecuting this case and a FBI agent were present at interviews of one of the victims by the Anchorage Police Department. But Kohring was not made aware of the investigation or any of the allegations until he received the newly-disclosed information on remand.

The district court addressed this information by referencing its discussion of the same evidence in *United States v. Kott*, 2010 WL 148447 (D. Alaska Jan. 13, 2010), a similar political-corruption case where Allen was also a key witness. There (and, by implication, here), the district court concluded the evidence was favorable and suppressed by the government, satisfying the first two *Brady/Giglio* elements. *See id.* at *9. The district court concluded the evidence was not material, though, because it would have been excluded under 403 of the Federal Rules of Evidence, and Kohring could not have otherwise employed it to attack Allen's "character for truthfulness" under Rule 608, since it was extrinsic evidence. *See id.*

To be material under *Brady/Giglio*, "undisclosed information or evidence acquired through that information must be admissible," *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989), or capable of being used "to impeach a government witness," *United States v. Price*, 566 F.3d 900, 911-12 (9th Cir. 2009). We review for abuse of discretion a district court's determination that information would be inadmissible or could not be used for impeachment. *Id.* at 912 (citing *United States v. Scott*, 74 F.3d 175, 177 (9th Cir. 1996)).

The district court abused its discretion when it concluded the newly-disclosed information concerning Allen's alleged sexual misconduct would be inadmissible or could not be

used for impeachment. First, Rule 403 does not foreclose Kohring's use of the information. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403 (emphasis added).

[7] The district court concluded the material would have been inadmissible under Rule 403 because it would have been unfairly prejudicial, would have confused the issues, and would have been needlessly cumulative, because the jury was already aware that Allen was cooperating with the government to avoid corruption charges stemming from his relationship with Kohring, Kott, and others. We disagree.

The evidence was certainly prejudicial, but not unfairly so. Even if there is some danger of unfair prejudice or confusion of the issues, that danger does not "substantially outweigh" the probative value of the information. Evidence that Allen attempted to suborn perjurious testimony from one of the minors and attempted to make another unavailable for a trial would have been highly probative of his "character for truthfulness." *See* Rule 608(b) (permitting cross-examination on specific instances of misconduct "if probative of truthfulness or untruthfulness"). And the district court could have contained the prejudicial effect of the material, as well as any possible confusion of the issues, by limiting its introduction to the essential facts necessary to reveal Allen's character for truthfulness.

Moreover, the material would not have been needlessly cumulative. The fact that Allen might have had a motive to testify against Kohring in order to gain leniency as to his cor-

ruption charges does not mean that evidence of a different bias or motive would be cumulative. *See, e.g.*, *Horton v. Mayle*, 408 F.3d 570, 579 (9th Cir. 2005) (citing *Napue*, 360 U.S. at 270 (holding that some evidence of bias does not diminish the value of other evidence describing a different source of bias)); *Banks v. Dretke*, 540 U.S. 668, 702-03 (2004) (holding impeachment evidence was not "merely cumulative" where the withheld evidence was of a different character than evidence already known to the defense). Indeed, evidence of Allen's sexual misconduct with a minor would have shed light on the magnitude of Allen's incentive to cooperate with authorities and would have revealed that he had much more at stake than was already known to the jury. Beyond facing serious criminal charges, the newly-disclosed information shows Allen was very distressed at the prospect of his alleged sexual misconduct becoming public. In an FBI interview, Allen said he would "become unglued" if the allegations were published in the media).

**[8]** Even though the information does not run afoul of Rule 403, the question remains as to whether it would have been admissible or whether Kohring could have used it to impeach Allen. We conclude that, at a minimum, Kohring could have used the information on cross-examination to impeach Allen. *See, e.g.*, *Lindh v. Murphy*, 124 F.3d 899 (7th Cir. 1997) (holding that a defendant was denied his Sixth Amendment right to cross-examination when he was barred from questioning an expert witness about potential bias stemming from accusations of sexual impropriety with several patients that resulted in criminal charges and the loss of his medical license and faculty position).

**[9]** The Confrontation Clause of the Sixth Amendment "guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him." *United States v. Larson*, 495 F.3d 1094, 1102 (9th Cir. 2007) (en banc) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (internal quotations omitted)). That right includes "the

right of effective cross-examination." *Id.* (citing *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). We have recognized that "[e]ffective cross-examination is critical to a fair trial because '[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.' " *Id.* (quoting *Davis*, 415 U.S. at 316). And we, like the Supreme Court, have "emphasized the policy favoring expansive witness cross-examination in criminal trials." *Id.* (citing *United States v. Lo*, 231 F.3d 471, 482 (9th Cir. 2000); *Van Arsdall*, 475 U.S. at 678-79; *Davis*, 415 U.S. at 316).

We observed in *Larson* that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* (quoting *Davis*, 415 U.S. at 316-17). Thus, "jurors [are] entitled to have the benefit of the defense theory before them so that they [can] make an informed judgment as to the weight to place on [the Government witness'] testimony." *Id.* (quoting *Davis*, 415 U.S. at 317). We explained in *United States v. Schoneberg*:

> The constitutional right to cross-examine is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation," but that limitation cannot preclude a defendant from asking, not only "whether [the witness] was biased" but also "to make a record from which to argue why [the witness] might have been biased."

396 F.3d 1036, 1042 (9th Cir.2005) (quoting *Davis*, 415 U.S. at 318) (footnotes omitted) (alterations in original).

We consider three factors "in determining whether a defendant's Confrontation Clause right to cross-examine is violated: (1) [whether] the excluded evidence was relevant; (2) [whether] there were other legitimate interests outweighing the defendant's interest in presenting the evidence; and (3)

[whether] the exclusion of the evidence left the jury with sufficient information to assess the credibility of the witness." *Id.* at 1103 (alterations in original) (citing *United States v. Beardslee*, 197 F.3d 378, 383 (9th Cir. 1999)).

**[10]** Here, the information related to Allen's alleged sexual misconduct was relevant, particularly with respect to his character for truthfulness. Rule 608 would have expressly permitted Kohring to cross-examine Allen about this specific conduct.[4] And, as discussed above, there were no interests outweighing Kohring's interest in presenting the evidence. Finally, if the district court would have prevented Kohring from cross-examining Allen on the alleged sexual misconduct, the jury would not have had sufficient information to assess Allen's credibility. The alleged misconduct would have added an entirely new dimension to the jury's assessment of Allen. Allen was "the prosecution's star witness." *Price*, 566 F.3d at 914 (quoting *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997)). As we have previously held, "Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case." *Id.* (quoting *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005)). Indeed, had the evidence of Allen's past conduct been disclosed, "there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment" regarding Allen's testimony against Kohring. *See Price*, 566 F.3d at 914 (quoting *Cone v. Bell*, ___ U.S. __, 129 S. Ct. 1769, 1771 (2009)).

---

[4]Even if Kohring would not have been permitted to introduce extrinsic evidence in the course of cross-examination under Rule 608(b), Kohring would have still been permitted to ask Allen about the alleged misconduct. And even if Allen would have denied the allegations, the jury would have been able to observe his demeanor when he answered the questions, which might have been telling. *See, e.g.*, *Barber v. Page*, 390 U.S. 719, 725 (1968); *California v. Green*, 399 U.S. 149, 157-58 (1970).

2

**[11]** The newly-disclosed information also illustrates Allen's difficulty with remembering key facts, as well as Allen's and Smith's differing (and sometimes changing) recollections as to how much money they paid Kohring. Setting aside for a moment the question of the information's admissibility, the information is exculpatory and has impeachment value.

For instance, a government attorney's handwritten notes from September 1, 2006, read, "Island Pub meeting: bad recall of mtg." When Allen was apparently asked about the alleged McDonald's payment, handwritten notes from Allen's attorney state Allen had a "vague memory" and "didn't remember how this fit in." When asked about the Island Pub payment, Allen's attorney's notes read, "Bill DNR why he gave VK the $1,000." Undated notes written by an unknown author read, "Bill . . . meds affecting cognitive memory." These are only a few examples of handwritten notes, both dated and undated, that tend to show Allen had difficulty remembering the details of key events.

**[12]** The newly-disclosed information also illustrates inconsistent views on how much money was actually paid to Kohring. At trial, Allen testified he paid Kohring $1,000 at the Island Pub dinner, between $700-$1,100 in Suite 604 (the "Easter Egg" & "Girl Scout Uniform" payments), and $600-$700 outside of McDonald's. A series of reports and e-mails reveals uncertainty, though, as to these amounts.

For example, with respect to the Island Pub payment, the government withheld FBI Form FD-302 interview reports ("FBI 302 reports") showing that Allen failed to mention the Island Pub payment at his first debriefing with the FBI on August 31, 2006. Allen was interviewed two days later with his attorney present and initially said he thought "he gave Kohring $500 cash on about four occasions to help him out,

and gave him $1,000 once when Kohring's credit cards were maxed out." At the same interview, though, Allen "confirmed" he gave Kohring $1,000 at the Island Pub. Handwritten notes by the prosecutor and Allen's attorney show Allen was also confused as to who was present at the Island Pub meeting.

With respect to the Girl Scout uniform and Easter Egg payments in Suite 604, a newly-disclosed FBI 302 report from September 1, 2006, reads:

> ALLEN thinks during that particular meeting, SMITH probably gave KOHRING $300-$400 in cash, and ALLEN probably gave KOHRING $500, ostensibly to apply towards the purchase of KOHRING's daughter's Girl Scout uniforms.

A newly-disclosed IRS memorandum of an interview with Allen on December 11-12, 2006, reads:

> BILL ALLEN recalled giving VIC KOHRING about $1,000 which BILL ALLEN said was for Vic Kohring's daughter's Girl Scout uniform. BILL ALLEN also recalled that he had given Vic Kohring $1,000 at the Island Pub in Juneau a month before the meeting in Suite 604.

But an October 3, 2007, e-mail exchanged among the prosecution team reveals a stark inconsistency between Allen's and Smith's recollection of how much money was allegedly transacted:

> Smith and Allen have different recollections re how much they provided to VK in Ste 604. BA thinks he was trying to give VK $1,000 and he asked RS if he had any hundreds, b/c he may not have enough with him at the time. BA generally recalls giving two amounts to VK totaling anywhere b/w $600-$1,000.

He believes he counted out $500 from his wallet and gave it to VK for the second payment.

RS has somewhat better recall on the issue. *He believes that when BA asked him for money, he only gave BA $100.* Although he's speculating to a certain degree, he believes BA may have asked him for money b/c BA didn't have any hundreds on him and the Easter Egg story (which RS had heard BA tell in the past) involves stuffing $100 in an egg.

As for the second payment, RS recalls BA counting out 5 bills. RS assumes these were only $20 bills if BA did not have any hundreds with him. *If RS's assumptions are right, then VK only received $200 total.*

(emphasis added).

Finally, in terms of the alleged McDonald's payment, two newly-disclosed FBI 302 reports show that, during his first two debriefings, Allen failed to mention any payment made to Kohring at McDonald's. In particular, during one of the debriefings, "Allen did not recall giving Kohring cash gifts any other times during the most recent [2006] legislative session" other than the Island Pub payment in February 2006. Allen's first mention of the McDonald's payment came in a March 16, 2007, interview (memorialized in a newly-disclosed FBI 302 report), but Allen did not connect that payment to any specific date, he only said that it took place sometime during the 2006 legislative session.

**[13]** This newly-disclosed information is favorable to Kohring, thus satisfying the first element of *Brady/Giglio*. *See* 373 U.S. at 87; *Williams*, 547 F.3d 1187. The information tends to cast some doubt on the amounts that were allegedly paid to Kohring, as well as whether the payments were made at all. It also shows that Allen had difficulty remembering

details of key events. The second element of *Brady/Giglio* is also satisfied because the information was suppressed. *Id.*; *Williams*, 547 F.3d at 1202.

**[14]** We also conclude that some of the information was material, satisfying the third element of *Brady/Giglio*. *Id.*; *Williams*, 547 F.3d at 1202. As discussed above, in order for the newly-disclosed information to be material under *Brady/Giglio*, the information must be either admissible, lead to information that will be admissible, or capable of being used for impeachment. *Kennedy*, 890 F.2d at 1059; *Price*, 566 F.3d at 911-12. Nevertheless, a prosecutor does not have a duty to disclose "his or her strategies, legal theories or impressions of the evidence." *Morris*, 447 F.3d at 742. In other words, the prosecutor does not have a duty under *Brady/Giglio* to disclose all opinion work product. "[I]n general, a prosecutor's opinions and mental impressions of the case are not discoverable under *Brady*[*/Giglio*] *unless* they contain underlying exculpatory facts." *Id.* (emphasis original).

Here, some of the newly-disclosed information is opinion work product, otherwise inadmissible, or not capable of being used for impeachment (e.g., some of the undated, unidentified handwritten notes). Other information, such as the FBI 302 reports would, on the other hand, likely be either admissible or capable of being used for impeachment. And even some of the facts contained in the opinion work product should have been disclosed. Consider, for instance, the October 3, 2007, e-mail. Certain statements in the e-mail reveal the prosecutor's " impressions of the evidence." *Morris*, 447 F.3d at 742. With regard to Smith's recollection of how much money Allen gave Kohring in Suite 604, the e-mail reads "RS has somewhat better recall on the issue." This is, arguably, the prosecutor's impression of Smith's memory (admittedly, it could also be a fact). However, the statement that "[Smith] believes that when BA asked him for money, he only gave BA $100" is clearly an "underlying exculpatory fact" that should have been disclosed to Kohring if it was not merely

cumulative. *See id.* Thus, while the prosecution did not have a duty to disclose the e-mail itself or the opinion work product in the e-mail, it did have a duty to disclose the non-cumulative "underlying exculpatory facts" in the e-mail. *See id.* The same can be said with respect to other newly-disclosed information that is arguably opinion work product (e.g., the attorneys' handwritten notes).

The newly-disclosed information also has to be more than "merely cumulative" to be material under *Brady/Giglio*. *Id.* (citing *United States v. Morashi*, 913 F.2d 724, 732 (9th cir. 1990)). Here, the newly-disclosed information regarding Allen's memory problems would have been merely cumulative if presented at trial. At trial, Kohring's attorney exploited Allen's poor memory before the jury in both cross-examination and closing argument. In cross-examination, Kohring's attorney asked about the Island Pub payment, the Easter egg and Girl Scout uniform payments, and the McDonald's payment. Allen's testimony displayed his difficulty with remembering the specific payments, who witnessed the payments, and the purpose of the payments. Kohring's attorney then took full advantage of Allen's poor memory and confusion in his closing argument:

> Mr. Allen's demeanor on the stand was rather pathetic. Now, he has—and I don't mean to make fun of it—but he has memory problems, he has a brain injury. He obviously drinks too much. His demeanor on the stand—and remember his brain injury predated any of this that we're talking about here—but his demeanor on the stand was completely self-serving and pathetic.

**[15]** We have previously held that when defense counsel sufficiently impeaches a government witness in cross-examination and closing argument, the defendant cannot later claim a *Brady/Giglio* violation on account of additional undisclosed evidence supporting the impeachment. *See Hovey v.*

*Ayers*, 458 F.3d 892, 921 (9th Cir. 2006). In such circumstances, the evidence is cumulative because the grounds for impeachment are "no secret" to the jury. *Id.* Here, Allen's own testimony on cross-examination, along with counsel's closing argument, put Allen's poor memory and confusion directly before the jury. Further evidence of Allen's poor memory and confusion would have only been cumulative and would probably not have impacted the jury's verdict.

**[16]** The same is not true, though, with respect to some of the information regarding the amount of money allegedly paid to Kohring. At trial, for instance, Smith confirmed that the "agreed facts" in his plea agreement stated he and Allen paid Kohring up to $1,000 in Suite 604 on March 30, 2006. But he also testified that he could only approximate that amount because he did not know for sure how much Kohring was paid. Indeed, the October 3, 2007, e-mail indicates Smith was not sure as to the precise amount Kohring received. But the same e-mail also contains what would have inevitably been valuable impeachment evidence—Smith's belief that Allen gave Kohring only $200 or less. This difference could have potentially been important to the jury, because Kohring testified at trial that he only received "around $100" in Suite 604 that day and that the payment was a gift to a friend rather than a bribe. Similarly, the inconsistent payment amounts described in the FBI 302 reports and the IRS memo could have also been used as impeachment material.

3

**[17]** The newly-disclosed information also tends to show that Allen gave Kohring money partly out of pity and friendship. At trial, Allen testified he paid Kohring partly out of pity and friendship and partly to secure Kohring's loyalty and encourage him to perform certain legislative acts on Allen's behalf. A newly-disclosed FBI 302 report shows that Allen said he paid Kohring, at least partly, because he "felt sorry" for him and wanted to help him with his "financial problems."

Handwritten notes from an interview with Allen also show that Allen said he "gave stuff to VK because [he] is a friend." Other notes indicate that Allen said he "NEVER ASKED VIC TO DO ANYTHING IN EXCH. for cash or [unintelligible] or some benefit."

[18] This newly-disclosed information is favorable to Kohring, and it was suppressed, thus satisfying the first two elements of *Brady/Giglio*. *Brady*, 373 U.S. at 87; *Williams*, 547 F.3d at 1202. The information is also material and not "merely cumulative." *See Morris*, 447 F.3d at 741. Prior to trial the prosecution did, in fact, provide Kohring with a letter stating that Allen had said the payments were partly motivated by pity:

> Mr. Allen has advised the government that his motivation in providing these financial benefits to Mr. Kohring was partly because he felt sorry for Mr. Kohring regarding his personal financial situation and partly so that Mr. Kohring would take official acts on the part of VECO corporation.

Thus, for the purposes of *Brady/Giglio*, the prosecution met its obligation of alerting Kohring to Allen's statement that he paid Kohring partly out of pity. But the prosecution still had an obligation to disclose Allen's admission that he "NEVER ASKED VIC TO DO ANYTHING IN EXCH. for cash or [unintelligible] or some benefit." This statement is not necessarily inconsistent with Allen's testimony that he paid Kohring, at least in part, to encourage Kohring to undertake certain legislative acts. Many lobbyists and other individuals contribute to political campaigns with the same hope. But what the statement tends to show is that Allen himself never told or otherwise expressed to Kohring that the payments were *quid-pro-quo*. The statement adds an entirely different dimension to what Kohring knew before trial. It makes clear that, while Allen might have given Kohring money, he never told Kohring he was paying him to curry legislative favors. Had Kohr-

ing known that Allen made this and similar statements, he could have undoubtedly used it at trial.

4

**[19]** The newly-disclosed information contains what Kohring characterizes as two classes of exculpatory or impeachment information regarding Smith. The first includes undated handwritten notes, which show that Smith believed Kohring was beholden to Allen on account of campaign contributions —not payments. The same notes also state that Smith "[d]oesn't know what VK thought the cash payments represented—whether he viewed them as bribes or gifts." At trial, Smith testified that Allen's payments were intended to keep "Vic on board on political issues."

**[20]** This newly-disclosed information is arguably favorable and was suppressed. But it is not material. Smith testified at trial that—from his and Allen's perspective—the payments were politically motivated. The thrust of the newly-disclosed information is that Smith had no knowledge of what Kohring thought of the payments—whether he thought they were gifts or politically motivated. The undated notes are not likely admissible, and Kohring has not adequately shown how they could have been used to impeach Smith.

**[21]** The second class of information related to Smith concerns his relationship with a FBI special agent working on the case. According to material that Kohring viewed after trial (but did not obtain), Smith invited the agent and her husband to a golf tournament and then paid their tournament fees. The agent and her husband attended the tournament but did not reimburse Smith for the $500 entry fee. The agent said she "went golfing with Smith because she was extremely concerned about his mental condition . . . . Smith was having significant psychological troubles because of the pending federal criminal case against him [and she] was concerned Smith was possibly even suicidal . . . ."

Kohring argues he could have used this information in two ways at trial. First, he claims he could have "turned the free golf tournament . . . against the government by arguing that it showed bias and Smith's effort to curry favor with the lead case agent . . . ." Second, he argues that evidence of Smith's alleged mental instability demonstrated his susceptibility to coaching by Allen and others, and it "explain[ed] Smith's willingness to bend his story to fit the government's theory."

**[22]** This newly-disclosed information is not material under *Brady/Giglio*. With respect to Kohring's claim that it shows bias on the part of the government, the jury was well-aware that Smith was working closely with the government on the case, and evidence of the golf outing would have probably been "merely cumulative." *See Morris*, 447 F.3d at 742.

The government is generally under an obligation to disclose impeachment evidence that bears on the credibility of a witness, including evidence of poor mental and emotional health that may be provable on cross-examination. *United States v. Pryce*, 938 F.2d 1343, 1345-46 (D.C. Cir. 1991); *accord United States v. Smith*, 77 F.3d 511, 516 (D.C. Cir. 1996) ("Mental records can be material as impeachment evidence because they can cast doubt on the accuracy of a witness' testimony."). *Pryce* and *Smith*, though, are distinguishable from the facts here in an important way. In each of those cases, the withheld evidence was psychiatric reports and medical records, respectively. *Pryce*, 938 F.2d at 1345-46; *Smith*, 77 F.3d at 516. Here, the information concerning Smith's alleged mental instability comes from the FBI special agent's informal assessment. Her assessment is a far cry from the professional psychiatric reports and medical records in *Pryce* and *Smith*.

**[23]** Second, Kohring has not alleged that Smith suffered from mental instability at the time of the alleged payments. The First Circuit addressed this issue and concluded: "[W]e are aware of no court to have found relevant an *informally*

*diagnosed* depression or personality defect. Rather, federal courts appear to have found mental instability relevant to credibility only where, *during the time-frame of the events testified to*, the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness . . . that dramatically impaired her ability to perceive and tell the truth." *United States v. Butt*, 955 F.2d 77, 82-83 (1st Cir. 1992) (emphasis added); *accord United States v. Antone*, 981 F.2d 1059, 1061 (9th Cir. 1992); *see also United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995) ("Evidence of a witness's psychological history may be admissible when it goes to her credibility. In assessing the probative value of such evidence, the court should consider such factors as the nature of the psychological problem, . . . the temporal recency or remoteness of the history . . . and whether the witness suffered from the problem at the time of the events to which she is to testify, so that it may have affected her ability to perceive or to recall events or to testify accurately.")

5

**[24]** Finally, the newly-disclosed information includes a letter from one prosecutor to another, dated June 19, 2009, stating that "while it has not been memorialized in any interview reports or notes, it appears that at some point and on at least one occasion, [a former employee of the Alaska Attorney General's office] said that he did not think Mr. Kohring was dirty or corrupt, and [he] had the overall impression that if Mr. Kohring were corrupt, he may not realize it." The former employee, "was the source that developed investigative evidence related to Smith, Allen, and Tom Anderson." But the newly-disclosed information suggests the former employee made this statement on February 15, 2005, more than a year before most of the payments at issue here.

Kohring claims the statement would have been admissible exculpatory evidence under Fed. R. Evid. 404(a)(1) and 405(a). Presumably, Kohring's attorney could have asked the

former employee on cross-examination whether he thought Kohring was corrupt. Rule 404(a)(1) and 405(a) allow the defendant to present character evidence, in the form of opinion testimony, "for the purpose of proving action in conformity therewith on a particular occasion."

**[25]** The government, though, argues the statement would have been inadmissible under Rule 704(b) because it speaks to the "ultimate issue"—i.e., whether Kohring was corrupt. The government's reading of the rule, though, is misplaced. Rule 704(b) applies only to *expert* witnesses. *See, e.g.*, *United States v. Hofus*, 598 F.3d 1171, 1179-80 (9th Cir. 2010). The former employee did not testify as an expert. And Rule 704(a) clearly states that "[e]xcept as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." In other words, the Federal Rules of Evidence specifically permit the type of opinion testimony that the former employee might have offered. *See, e.g., United States v. Yarbrough*, 527 F.3d 1092, 1101-02 (10th Cir. 2008) (permitting opinion testimony relevant to intent "where the sole issue before the jury is whether a defendant undertook his undisputed acts with a prohibited state of mind.").

**[26]** That the evidence is likely admissible does not necessarily imply it is material. The newly-disclosed information tends to show the statement was made on February 15, 2005 —more than a year before the alleged payments and solicitation discussed here. As a result, the former employee's opinion in 2005 probably would have had little relevance to how the jury perceived Kohring's mental state at the time of the misconduct.

## B

After "first evaluat[ing] the tendency and force of each item of suppressed evidence," we must "then evaluate its

cumulative effect at the end of the discussion." *Barker*, 423 F.3d at 1094 (quoting *Kyles*, 514 U.S. at 436). Having reviewed the specific undisclosed evidence, we turn to a collective analysis of the *Brady/Giglio* claims. *Jackson*, 513 F.3d at 1076. In doing so, we are mindful that a jury's verdict should be overturned as a result of the prosecution's suppression of favorable evidence only if that evidence is material. *Id.* at 1076. Suppressed evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. There is a "reasonable probability" of prejudice when suppression of evidence "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (citing *Bagley*, 473 U.S. at 678). A "reasonable probability" may be found "even where the remaining evidence would have been sufficient to convict the defendant." *Jackson*, 513 F.3d at 1071 (citing *Strickler*, 527 U.S. at 290).

**[27]** The prosecution's suppression of evidence in this case "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434. The newly-disclosed information includes several thousand pages of relevant material. We are cognizant of the prosecution's explanation that it disclosed the voluminous material out of an abundance of caution. And we recognize that the prosecution might not have had a duty to disclose all the information it did. However, a substantial amount of the material is either admissible on its face, could have been used as impeachment material, or is likely inadmissible but memorializes exculpatory facts or impeachment information that should have been disclosed.

**[28]** The newly-disclosed information contains several different classes of information that, collectively, give rise to "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. Had the information been disclosed to Kohring, for instance, Kohring would have been able to impeach Allen with evidence of his alleged sexual

misconduct. Contrary to the government's claim, this evidence would not have been cumulative in light of the jury's awareness of the plea agreement Allen had with the government. Evidence of the sexual misconduct would have added an entirely new dimension to Allen's possible motives for cooperating with the government. And, specifically, evidence that Allen attempted to suborn perjury from one of the alleged victims and attempted to make another unavailable to testify would have probably had a substantial impact on the jury's assessment of Allen's character for truthfulness.

In terms of the payments made to Kohring, the information shows stark inconsistencies in how much Allen and Smith believed they paid Kohring. The October 3, 2007, e-mail shows that Smith believed Allen only paid up to $200 to Kohring in Suite 604 on March 30, 2006. This is a far cry from the $700-$1,100 Allen testified to and is more consistent with Kohring's testimony that he received "around $100." Even if Kohring was not being paid out of friendship or pity, the fact that his account of the amount paid to him was potentially consistent with Smith's account might have made Kohring more credible in the eyes of the jury. But, because of the prosecution's suppression, Kohring did not have the opportunity to cross-examine or impeach Smith as to that account.

[29] Taken together, the newly-disclosed information is material and, as a result, the prosecution violated *Brady/Giglio*.

## III

[30] We are left to decide the appropriate remedy. The government clearly should have disclosed a substantial amount of the information in question. However, we do not have sufficient evidence to conclude the prosecution "acted flagrantly, willfully, and in bad faith." *See United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008). As a result, we do not exercise our supervisory authority by dismissing

the Superceding Indictment. *See id.* (citing *United States v. Kearns*, 5 F.3d 1251, 1255 (9th Cir. 1993) (holding that even though the government's conduct "may have been negligent, or even grossly negligent," it did not rise to the level of flagrant misconduct)). Nor are we able to conclude that the violations were a result of "outrageous government conduct" that amounted "to a due process violation," which would also warrant dismissal of the Superceding Indictment. *Id.* at 1084. We have previously observed that "the appropriate remedy" for a *Brady/Giglio* violation "will usually be a new trial." *Id.* at 1086. That is the case here.[5]

**[31]** Kohring's conviction is vacated, and this matter is remanded to the district court for a new trial. We need not, and do not, reach any other issue urged by the parties on appeal.

---

[5]Another reason advanced by the partial dissent for the exercise of our supervisory authority to dismiss this indictment is "the prosecution's unrepentant attitude." In fairness, we note that the government took corrective action at the Public Integrity Section, which was primarily responsible for this prosecution, and installed a completely new prosecution team. It was the government, through this new team, that first suggested to us that the case should be remanded to the district court for it to examine whether there were any *Brady/Giglio* violations. It then produced the voluminous record that is subject of this appeal. The team also withdrew its opposition to Kohring's request to be released on bail pending resolution of the remand. The partial dissent also suggests that dismissal is justified "to release Kohring from further anguish and uncertainty." This rationale has yet to be recognized as an independent basis on which to exercise our supervisory power to dismiss an indictment, and we decline to do so here. In addition, we are also cognizant of the detailed and careful analysis by a highly respected presiding trial judge that there was more than sufficient evidence to support the verdict, and that he was unpersuaded that the result would be different even with introduction of the new information. We are also mindful that Kohring was acting in a position of public trust when the alleged acts were committed. Under the circumstances, despite the powerful views of our friend and esteemed colleague, we conclude that the exercise of supervisory power to dismiss the indictment would be inappropriate in this case. Rather, the proper course is to place the case, once again, in the hands of a jury, fully apprised of all the relevant information.

**VACATED and REMANDED.**

---

B. FLETCHER, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I and II of the majority's opinion, which unequivocally establish that the prosecution withheld and suppressed material that was favorable to the defense, in violation of *Brady* and *Giglio*, and that these suppressions undeniably prejudiced Kohring. I respectfully dissent, however, from Part III. Because this case exemplifies "flagrant prosecutorial misconduct," *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008), I would have this court exercise its supervisory authority to dismiss the Superceding Indictment with prejudice.

"A court may dismiss an indictment under its supervisory powers only when the defendant suffers 'substantial prejudice' and where 'no lesser remedial action is available.' " *Id.* at 1087 (internal citations omitted). Both conditions are satisfied here. The majority opinion clearly establishes the substantial prejudice Kohring has suffered as a result of the prosecution's misconduct in this case. And, as discussed below, the prosecution's unrepentant attitude indicates that no lesser remedial action will be effective.

A court may exercise its supervisory power "to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991), *abrogated on other grounds as recognized by United States v. W.R. Grace*, 526 F.3d 499, 511 n.9 (9th Cir. 2008). Each of these considerations is relevant in this case.

First, as detailed in the majority's opinion, the prosecution's *Brady/Giglio* offenses violated Kohring's due process right to a fair trial. *See Chapman*, 524 F.3d at 1086 (observing that *Brady* violations "are just like other constitutional violations" and may justify the dismissal of an indictment "when the prosecution's actions rise . . . to the level of flagrant prosecutorial misconduct"). Furthermore, the prosecution's misconduct is an affront to the integrity of our system of justice. The prosecution failed to disclose *thousands* of pages of material documents — including FBI reports, memoranda, and police reports — until *after* Kohring's conviction. Even then, the prosecution failed to fulfill its disclosure obligations, turning over the previously undisclosed documents only *after* the defense filed a *Brady* motion.

I disagree with the majority's conclusion that the prosecution's conduct does not amount to flagrant, willful bad-faith misbehavior. *See* Maj. Op. at 3465. Our court has "never suggested . . . that 'flagrant misbehavior' does not embrace reckless disregard for the prosecution's constitutional obligations." *Chapman*, 524 F.3d at 1085. Here, the record is replete with such reckless disregard. To cite just two examples: The late-disclosed information establishes that the prosecution was aware of the Anchorage Police Department's investigation into Allen's sexual misconduct, long before Kohring's trial began. It also indicates that Allen and Smith had wildly differing recollections as to how much money they allegedly gave to Kohring. This information undermines the prosecution's star witness and goes to the heart of the charges brought against Kohring. The prosecution's failure to timely disclose this information amounts to a reckless disregard for its constitutional obligations under *Brady/Giglio*.

Despite these egregious violations of basic prosecutorial responsibilities, the prosecution insists that Kohring's trial was justly conducted and his conviction fairly obtained. The prosecution's refusal to accept responsibility for its misconduct is deeply troubling and indicates that a stronger remedy

is necessary to impress upon it the reprehensible nature of its acts and omissions. *See Chapman*, 524 F.3d at 1087 ("[W]e [have] made clear that in determining the proper remedy for prosecutorial misconduct, we must consider the government's willfulness in committing the misconduct and its willingness to own up to it." (quoting *United States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir. 1993) (punctuation omitted))). In this case, dismissal of the Superceding Indictment is justified not only as a deterrent but to release Kohring from further anguish and uncertainty.

I understand, as noted by the majority, that the government undertook certain after-the-fact amends, such as corrective action within the Public Integrity Section, installing a new prosecution team, and withdrawing its opposition to Kohring's request to be released on bail pending resolution of our remand to the district court. None of these actions, however, cure what happened to Kohring during his trial. I feel strongly that, if one looks closely at what is actually at stake in this case — ensuring a fair trial for Victor Kohring — the government has failed to make proper amends. For these reasons, I would exercise our supervisory authority to dismiss the Superceding Indictment with prejudice.