# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

INTERMUNE, INC. and ROCHE HOLDINGS, INC.,

    Plaintiffs,

    v.

W. SCOTT HARKONEN, M.D.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2021-0694-NAC

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: September 22, 2023
Date Decided: August 1, 2024

Karen A. Jacobs, Megan W. Cascio, Courtney Kurz, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Laurie Carr Mims, Benjamin D. Rothstein, Candice Mai Khanh Nguyen, Melissa Cornell, Catherine C. Porto, KEKER, VAN NEST & PETERS LLP, San Francisco, California; *Counsel for Plaintiffs InterMune, Inc. and Roche Holdings, Inc.*

Michael A. Weidinger, Megan Ix Brison, PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Wilmington, Delaware; Elizabeth Sandza, Richard Sandza, SANDZA LAW, PLLC, Washington, D.C.; *Counsel for Defendant W. Scott Harkonen, M.D.*

**COOK, V.C.**

Delaware holds corporations accountable for their advancement obligations. But this case serves as a reminder that advanced sums sometimes must be repaid.

Defendant Dr. W. Scott Harkonen was the Chief Executive Officer of InterMune, Inc. ("InterMune" or the "Company"). Following the issuance of a misleading press release in 2002, Dr. Harkonen became the center of a federal government investigation and criminal trial. To fund his sophisticated and well-resourced defense, Dr. Harkonen requested and accepted very sizeable advancements. The Company funded the advancements via several director and officer ("D&O") insurance policies and from its own coffers. The advanced sums were subject to repayment if the litigation was found to be non-indemnifiable under Section 145 of the Delaware General Corporation Law ("DGCL"). A federal jury subsequently convicted Dr. Harkonen of felony wire fraud in 2009. Dr. Harkonen then embarked on nearly a decade of unsuccessful appeals to overturn that conviction.

In light of the wire fraud conviction, two of the Company's excess D&O insurance providers demanded, in arbitration, that InterMune and Dr. Harkonen repay the sums advanced to Dr. Harkonen to litigate the wire fraud charge. In 2019, InterMune and Dr. Harkonen settled with the two insurers. InterMune paid the settlements in full and retained its right to sue Dr. Harkonen for recovery. InterMune is exercising that right with this litigation.

Dr. Harkonen raised many of his defenses to InterMune's claim for the first time on the eve of trial. These defenses are both procedurally improper and

1

prejudicial to InterMune, which was deprived a fair opportunity to address the defenses in discovery and in its trial preparation.

And despite not filing a single counterclaim, Dr. Harkonen seeks a declaration that the Company must reimburse him for various legal expenses he accrued in a related California Medical Board disciplinary proceeding, two insurance arbitrations, advancement negotiations with InterMune, and a presidential pardon. Dr. Harkonen's claims, like his untimely defenses, are also improper.

The parties appeared before this Court for trial on a paper record. Based on my findings and our law, Dr. Harkonen is responsible for the legal expenses incurred in litigating his wire fraud conviction, and the Company is therefore entitled to recover the amounts it seeks in this action. Dr. Harkonen's claims do not fare any better. In addition to being procedurally improper, each of Dr. Harkonen's claims is either untimely or fails to satisfy the requirements for indemnification under Section 145.

## I. FACTUAL BACKGROUND

The preponderance of the evidence supports the following findings of fact. Fortunately, the material facts are undisputed or otherwise not subject to reasonable dispute.[1]

---

[1] Citations in the form of "JX — ([Descriptor])" refer to the joint exhibits the parties submitted for trial. Citations in the form of "TT —" refer to the trial transcript. Where appropriate, I have taken judicial notice of the decisions and filings in Dr. Harkonen's criminal proceedings, his collateral challenges to those proceedings, and the insurance arbitrations. *See* D.R.E. 201(b)(2), (c)–(d), 202(a)(1). Relevant decisions include *United States v. Harkonen* (*Harkonen I*), 2009 WL 1578712 (N.D. Cal. June 4, 2009); *United States v. Harkonen* (*Harkonen II*), 2010 WL 2985257 (N.D. Cal. July 27, 2010); *United States v.*

## A. The Creation of InterMune

InterMune is a biotechnology company incorporated in Delaware with its principal place of business in California.[2] During his tenure at InterMune, Dr. Harkonen served both as the Company's CEO and as a director on its board.

Under InterMune's bylaws (the "Bylaws"), the Company agreed to advance to its directors and officers "all expenses incurred by any director or officer" in connection with proceedings related to their role at the Company.[3] Additionally, the Company agreed to "indemnify its directors and officers to the fullest extent not prohibited by the DGCL or any other applicable law[.]"[4]

But the advancements were conditioned "upon [the] receipt of an undertaking" stating that the director or officer would repay advanced funds to the Company "if it should be determined ultimately that such person is not entitled to be indemnified

---

*Harkonen* (*Harkonen III*), 2011 WL 13250647 (N.D. Cal. Apr. 18, 2011), *aff'd*, 510 F. App'x 633 (9th Cir. 2013); *United States v. Harkonen* (*Harkonen IV*), 510 F. App'x 633 (9th Cir.), *cert. denied*, 571 U.S. 1110 (2013); *Harkonen v. United States* (*Harkonen V*), 571 U.S. 1110 (2013); *United States v. Harkonen* (*Harkonen VI*), 2015 WL 4999698 (N.D. Cal. Aug. 21, 2015), *aff'd*, 705 F. App'x 606 (9th Cir. 2017); *United States v. Harkonen* (*Harkonen VII*), 705 F. App'x 606 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 467 (2018); *Harkonen v. United States* (*Harkonen VIII*), 139 S. Ct. 467 (2018); *InterMune, Inc. v. Harkonen* (*Harkonen IX*), 2023 WL 3337212 (Del. Ch. May 10, 2023).

[2] *InterMune, Inc. v. Harkonen*, C.A. No. 2021-0694-NAC, Docket ("Dkt.") 167, Pre-Trial Stipulation Order ("PTO") ¶¶ 1, 3. In 2014, Roche Holdings, Inc. acquired the Company and agreed in the merger agreement to honor the Company's indemnification and advancement obligations. JX 558 § 6.06 (a)–(b) (Roche Merger Agreement). For simplicity, I will only refer to InterMune throughout the opinion, regardless of whether the time in question is pre- or post-acquisition.

[3] JX 14 § 43(c) (Bylaws).

[4] *Id.* § 43(a).

under [the Bylaws] or otherwise."[5] The Bylaws also shifted the claimant's fees to the Company if the claimant is "successful in whole or in part" in enforcing "[a]ny right to indemnification or advances granted by [the Bylaws.]"[6]

On March 22, 2000, the Company and Dr. Harkonen entered into an indemnity agreement (the "Indemnity Agreement"), whereby the Company "agree[d] to hold harmless and indemnify [Dr. Harkonen] to the fullest extent authorized or permitted by the provisions of the Bylaws and the [DGCL.]"[7] Further, the Indemnity Agreement, like the Bylaws, obligated the Company to advance to Dr. Harkonen "all expenses [he] incurred" in proceedings related to his employment at the Company.[8] But, again, this was conditioned on the "receipt of an undertaking by or on behalf of [Dr. Harkonen] to repay said amounts if it shall be determined ultimately that [he] is not entitled to be indemnified under the provisions of this Agreement, the Bylaws, the [DGCL] or otherwise."[9] The Indemnity Agreement also mirrored the Bylaws by requiring the Company to pay for the legal fees the claimant incurred enforcing "[a]ny right to indemnification or advances granted by this [Indemnity] Agreement[.]"[10] The

---

[5] *Id.* § 43(c).

[6] *Id.* § 43(d).

[7] JX 15 § 2 (Indemnity Agreement).

[8] *Id.* § 8 (emphasis added).

[9] *Id.*

[10] *Id.* § 9.

4

Indemnity Agreement was governed by Delaware law.[11] Neither the rights granted under the Bylaws[12] nor the rights granted under the Indemnity Agreement are exclusive.[13]

## B. Press Release and Dr. Harkonen's Departure

In 2000, InterMune received a license to commercialize interferon gamma-1b, better known by its brand name—Actimmune.[14] Before InterMune received the rights to Actimmune, a preliminary study was published in the New England Journal of Medicine suggesting that interferon gamma-1b improved lung function in certain patients with idiopathic pulmonary fibrosis ("IPF").[15] But the researchers noted that a larger study would need to be conducted to confirm the drug's potential effectiveness in treating lung diseases.[16] InterMune set off to conduct such a study.

From October 2000 through August 2002, InterMune ran a clinical trial to test the effectiveness of Actimmune in treating IPF.[17] In August of 2002, Dr. Harkonen drafted and issued a press release, on behalf of the Company, announcing the results

---

[11] *Id.* § 14.

[12] JX 14 § 43(e).

[13] JX 15 § 11.

[14] PTO ¶ 16; *Harkonen I*, 2009 WL 1578712, at *1.

[15] JX 6 at 5 (NEJM Article).

[16] *Id.*; *Harkonen I*, 2009 WL 1578712, at *2.

[17] PTO ¶ 17.

of its Actimmune clinical trial.[18]  The press release claimed that Actimmune "[r]educes mortality by 70% in Patients with Mild to Moderate [IPF]" and quoted Dr. Harkonen praising the study: "We are extremely pleased with [the clinical study's] results, which indicate Actimmune may extend the lives of patients suffering from [IPF]."[19]

The press release, however, misrepresented the clinical study results. Contrary to the press release, "overwhelming, undisputed evidence [showed] that the [clinical] study was a failure."[20]  Yet the press release characterized the study, which "missed its primary endpoint as well as all ten of the secondary endpoints[,]"[21] as "a major breakthrough" with "results [that] will support the use of Actimmune and lead to peak sales in the range of $400–$500 million per year[.]"[22]

A consultant who led the data monitoring committee for the Actimmune clinical trial commented that "if the press release were rated on a scale from 1 to 10, 10 being the most misleading, [the consultant] considered the press release a 10."[23] As a federal judge observed, Dr. Harkonen's follow-on "analyses were conducted with

---

[18] JX 177 (Press Release).

[19] *Id.*

[20] *Harkonen II,* 2010 WL 2985257, at *10.

[21] *Id.*

[22] JX 177.

[23] JX 387 at 4 (Form 302 for Dr. Thomas Fleming).

fraudulent intent."[24] Dr. Harkonen simply "cut that data and slice[d] it until [he] got the kind of results [he was] looking for."[25] Yet, "in the face of the [clinical] trial's objective failure," Dr. Harkonen nonetheless issued a press release that described the clinical trial as a success.[26]

On June 30, 2003, less than a year after issuing the press release, Dr. Harkonen resigned as the Company's CEO.[27] On September 25, 2003, the Company and Dr. Harkonen entered into a mutual release (the "Mutual Release"), which was governed by California law.[28] Through the Mutual Release, "[t]he Company . . . fully release[d Harkonen] . . . from and against any and all claims . . . connected with or relating to any and all acts . . . occurring on or before the Board Resignation Date."[29] Additionally, the parties agreed that the releases were "full and final releases covering all known and unknown, suspected or unsuspected injuries, debts, claims or damages as to the released matters only."[30] But the Mutual Release did not modify

---

[24] *Harkonen IV*, 510 F. App'x at 636.

[25] JX 502 at 190 (David Cory Direct Examination at California Trial).

[26] *Harkonen II*, 2010 WL 2985257, at *10.

[27] PTO ¶ 4; JX 361 § 1(a) (Mutual Release).

[28] JX 361 § 18.

[29] *Id.* § 4. The Board Resignation Date was defined as September 25, 2003. *Id.* § 11.

[30] *Id.* § 5.

7

Dr. Harkonen's advancement and indemnification rights.[31]  It did, however, include a prevailing party provision.[32]

## C.    Prosecution and Insurance Policies

In 2004, the U.S. Department of Justice (the "DOJ") launched an investigation into the Company's promotion of Actimmune.[33]  Several years later, on March 18, 2008, a grand jury indicted Dr. Harkonen "for fraudulently promoting . . . Actimmune (interferon gamma–1b) by putting out false and misleading information about the drug's effectiveness in treating [IPF]."[34]  Dr. Harkonen was indicted on one count of felony misbranding and one count of felony wire fraud.[35]

Dr. Harkonen, with the money advanced to him by the Company and its D&O insurance policies, assembled a well-qualified legal team.[36]  His defense attorneys included counsel from several prestigious law firms and a now-sitting judge of the Superior Court of California.[37]

---

[31] *Id.*

[32] *Id.* § 20.

[33] PTO ¶ 19.

[34] *Harkonen I*, 2009 WL 1578712, at *1.

[35] JX 470 (Criminal Indictment); PTO ¶ 21.

[36] *Harkonen VI*, 2015 WL 4999698, at *2.

[37] *Id.*

The Company had several layers of D&O insurance—a $10 million primary policy and four excess policies of $5 million apiece.[38] Only two of the five policies are relevant to the matter before me: one with Arch Specialty Insurance Company ("Arch") and the other with Old Republic Insurance Company ("Old Republic").[39]

By November 2008, the Company had depleted its primary D&O insurance policy along with its first layer of excess D&O coverage.[40] The Company expected its second layer of excess coverage to be depleted by the end of 2008.[41] Needless to say, the cost of litigating Dr. Harkonen's charges with a large and prestigious legal team was substantial.

In November 2008, Arch informed the Company that Arch did not intend to provide advancement to fund Dr. Harkonen's litigation of his criminal charges.[42] On December 1, 2008, in light of the already exhausted policies and Arch's denial of coverage, Dr. Harkonen sent a letter to the Company (the "December 2008 Letter") to remind it that "InterMune independently owes obligations to Dr. Harkonen to fund his ongoing defense[s]" under the Bylaws, the Indemnity Agreement, and the DGCL.[43] The next day, on December 2, 2008, Dr. Harkonen signed an undertaking

---

[38] JX 590 (Old Republic Arbitration Ruling).

[39] PTO ¶ 30.

[40] *Id.* ¶ 29.

[41] *Id.*

[42] JX 475 at 2 (Arch Letter Declining Coverage); PTO ¶ 31.

[43] JX 477 (December 2008 Letter).

9

(the "Undertaking") requesting advancement from the Company.[44] In the Undertaking, Dr. Harkonen pledged to repay the sums advanced and paid by the Company "if it shall be determined ultimately that [Dr. Harkonen is] not entitled to be indemnified under the provisions of the Indemnity Agreement, the [Bylaws], Delaware General Corporation Law, or otherwise."[45]

Two days later, on December 4, 2008, Dr. Harkonen initiated arbitration proceedings to compel Arch to provide him with advancement for his criminal defense.[46] InterMune also initiated arbitration against Arch on January 13, 2009.[47] On May 28, 2009, the arbitration panel issued an interim order for Arch to advance Dr. Harkonen's legal expenses.[48]

On September 29, 2009, following a six-week trial and four days of jury deliberation, the jury delivered its verdict.[49] The jury acquitted Dr. Harkonen of the misbranding charge but found him guilty of felony wire fraud.[50] Although the wire

---

[44] JX 476 (Undertaking).

[45] *Id.*

[46] JX 478 (InterMune's Demand for Arbitration).

[47] *Id.*

[48] JX 484 at 21 (Ruling on Arch Arbitration); PTO ¶ 34.

[49] *Harkonen II*, 2010 WL 2985257, at *2.

[50] JX 574 at 40 (Arch Arbitration Demand) (attaching the verdict form from Dr. Harkonen's wire fraud conviction); PTO ¶ 22. Although the PTO states the jury "acquitted him on one count of mislabeling," all other documents, including the verdict form and even other paragraphs in the PTO, refer to the charge as one of "misbranding." *Compare* PTO ¶ 22, *with* JX 470, JX 574, *and* JX 590.

fraud charge carried the potential for twenty years of imprisonment, a $250,000 fine, and three years of supervised release,[51] the court ultimately sentenced him to three years of probation with six months of home confinement, and ordered Dr. Harkonen to pay a $20,000 fine and complete 200 hours of community service.[52]

## D.    Subsequent Litigation

On December 4, 2009, Dr. Harkonen filed a motion for a judgment of acquittal and a motion for a new trial.[53]  He claimed "that the government failed to present sufficient evidence such that the jury could find, beyond a reasonable doubt, that he knowingly made a false or fraudulent statement with the intent to defraud."[54] Having blown through the Arch policy by the end of 2009,[55] Dr. Harkonen drew from InterMune's Old Republic policy, which kicked in on January 26, 2010 but was depleted by the end of June 2010.[56]

Soon after, on July 27, 2010, the U.S. District Court of the Northern District of California denied Dr. Harkonen's post-trial motions in their entirety.[57]  In light of Dr.

---

[51] JX 470 at 3.

[52] PTO ¶ 24.

[53] *Harkonen II*, 2010 WL 2985257, at *2.

[54] *Id.* at *3.

[55] PTO ¶ 35.

[56] JX 590 at 2.

[57] *Harkonen II*, 2010 WL 2985257, at *20; PTO ¶ 23.

11

Harkonen's wire fraud conviction, Arch sought to recoup the amounts it paid to Dr. Harkonen under the D&O policy, citing the policy's fraud exclusion.[58]

Dr. Harkonen subsequently requested relief from his wire fraud conviction, this time on the basis that he was entitled to a new trial based on "newly discovered evidence" found in an amicus brief to the U.S. Supreme Court.[59] In the amicus brief, the United States government argued "that statistical evidence is not the only reliable indication of causation[.]"[60] The District Court noted that "it [was] unclear how the [amicus] brief is 'newly discovered evidence,'"[61] and explained that the amicus brief did not change the fact that Dr. Harkonen materially misrepresented the clinical trial in the press release.[62] On April 18, 2011, the District Court denied Dr. Harkonen's motions for a new trial.[63]

## E. Reining In Fees

The bills continued to roll in at what InterMune described as a "profligate rate."[64] On September 11, 2011, the Company's in-house counsel reached out to Dr.

---

[58] JX 574. The fraud exclusion barred coverage for claims arising out of a "deliberate criminal or deliberate fraudulent act." *Id.* at 5.

[59] *Harkonen III*, 2011 WL 13250647, at *1. Dr. Harkonen also filed a motion for a new trial, alleging a *Brady* violation. *Id.*

[60] *Id.* at *8.

[61] *Id.*

[62] *Id.* at *5.

[63] *Id.* at *10.

[64] Dkt. 153, Pls.' Opening Pre-Trial Br. ("Pls.' OB") at 7.

Harkonen to challenge the reasonableness of his litigation expenses, writing that "we find it difficult to accept that fees of approximately $4 million—fees incurred before even the opening appellate brief has been filed—can be necessary and reasonable in a matter involving a single defendant and a single claim."[65] In response to the Company's hesitancy at the ever-growing litigation costs, on September 16, 2011, Dr. Harkonen's Delaware counsel reached out to the Company to enforce Dr. Harkonen's "rights to advancement and indemnification under Article XI of the InterMune Bylaws."[66]

Shortly after the Company's in-house counsel questioned the reasonableness of Dr. Harkonen's litigation costs, Dr. Harkonen hired another lawyer for his legal team.[67] The Company's counsel again disputed the reasonableness of Dr. Harkonen's legal expenses and argued that there was "no reason why Dr. Harkonen should need to supplement his existing (and sizeable) legal team."[68]

On December 13, 2011, the Company and Dr. Harkonen entered into a settlement agreement (the "2011 Settlement Agreement") to address the Company's obligation to advance Dr. Harkonen's legal expenses.[69] The 2011 Settlement Agreement attempted to settle the ongoing disputes surrounding the reasonableness

---

[65] JX 533 (Simon Email to Harkonen).

[66] JX 621 at 16 (Collins Email to InterMune).

[67] JX 537 (Simon Email to Haddad).

[68] *Id.*

[69] JX 539 (2011 Settlement Agreement); PTO ¶ 51.

of Dr. Harkonen's legal expenses by setting budgets for legal expenses through 2012.[70] In the 2011 Settlement Agreement, the Company also agreed to pay almost $2 million of Dr. Harkonen's outstanding legal expenses.[71] Dr. Harkonen asserts that he incurred $90,132.83 in legal expenses from his Delaware counsel in resolving the advancement dispute that led to the 2011 Settlement Agreement.[72]

## F.      More Federal Court Litigation

On May 16, 2011, Dr. Harkonen appealed his wire fraud conviction to the U.S. Court of Appeals for the Ninth Circuit.[73] Dr. Harkonen advanced several arguments on appeal, including that the evidence was insufficient to support his conviction, the First Amendment protected the fraudulent press release, the jury instruction was improper, and the District Court had misapplied the law.[74] On March 4, 2013, a Ninth Circuit panel rejected each of these arguments and affirmed the District Court's ruling.[75] On August 5, 2013, Dr. Harkonen petitioned the U.S. Supreme

---

[70] JX 539.

[71] *Id.* §§ 1–2. This payment consisted of a $1.7 million payment to Sidley Austin and a $141,746 payment to Dennis Riordan.

[72] *See* JX 656 at Overview (May 2023, Harkonen Legal Expenses).

[73] *Harkonen III*, 2011 WL 13250647, *appeal docketed*, No. 11-10242 (9th Cir. May 16, 2011).

[74] *Harkonen IV*, 510 F. App'x at 635–39.

[75] *Id.*; PTO ¶ 25.

14

Court for a writ of certiorari, which the Supreme Court denied on December 16, 2013.[76]

Following the U.S. Supreme Court's certiorari denial, the Company wrote to Dr. Harkonen's counsel that, "in light of the final judgment in the case, as of December 16, 2013, it has been determined that Dr. Harkonen is not entitled to be indemnified by InterMune."[77]

On July 30, 2014, Dr. Harkonen filed a petition for a writ of error *coram nobis*, arguing he was the victim of ineffective counsel.[78]  On August 21, 2015, the U.S. District Court for the Northern District of California denied his petition, noting that for every example Dr. Harkonen asserted was evidence of ineffective counsel, "ample evidence supports a finding that each of these strategic decisions was objectively reasonable[.]"[79]

Dr. Harkonen again appealed to the U.S. Court of Appeals for the Ninth Circuit, arguing the District Court erred in denying his petition for a writ of error *coram nobis*.[80]  On December 4, 2017, the Ninth Circuit concluded that "the district

---

[76] *Harkonen V*, 571 U.S. at 1110; PTO ¶ 26.

[77] JX 554 at 1 (Topel Email to InterMune).

[78] *Harkonen VI*, 2015 WL 4999698, at *1; PTO ¶ 27.  The writ of error *coram nobis* is available to convicted persons who are ineligible for *habeas corpus* relief (which is only available to convicted persons in custody).  Because Harkonen was on probation rather than in custody, he was ineligible for *habeas corpus* relief.  *See* 28 U.S.C. § 2255(a).

[79] *Harkonen VI*, 2015 WL 4999698, at *10.

[80] *Harkonen VII*, 705 F. App'x at 607; PTO ¶ 27.

15

court did not abuse its discretion" and affirmed the lower court's ruling.[81] Dr. Harkonen then sought a writ of certiorari from the U.S. Supreme Court of the United States for a second time. The Supreme Court subsequently denied his petition for writ of certiorari on November 5, 2018.[82]

## G.    Medical Board of California Disciplinary Action

Dr. Harkonen's wire fraud conviction also had professional ramifications. In 2011, the Medical Board of California (the "MBC") brought a disciplinary action against him based on the 2002 press release and his subsequent wire fraud conviction.[83] The MBC asserted two causes for the action: (1) Dr. Harkonen was convicted of a crime related to the practice of medicine, which violated California's Business and Professions Code (the "CBPC") and (2) Dr. Harkonen made false statements related to the practice of medicine, also in violation of the CBPC.[84] The Company offered to provide an attorney to defend Dr. Harkonen in the MBC action,[85] but Dr. Harkonen declined the offer, opting to select his own counsel.[86]

---

[81] *Harkonen VII*, 705 F. App'x at 607; PTO ¶ 27.

[82] *Harkonen VIII*, 139 S. Ct. at 467; PTO ¶ 27.

[83] JX 561 (MBC Decision).

[84] *Id.*

[85] JX 530 (InterMune Letter Confirming Defense for MBC Litigation).

[86] JX 526 (Riordan Letter Confirming Retainer and Representation).

On December 13, 2012, in connection with the MBC proceeding, an administrative law judge issued an order revoking Dr. Harkonen's medical license.[87] Despite not having used his medical license for many years,[88] Dr. Harkonen challenged the order.[89] On August 26, 2013, the Superior Court of the State of California for the County of San Francisco granted Dr. Harkonen's challenge on the basis that "the administrative law judge excluded all of petitioner's evidence."[90] The court remanded the matter for reconsideration by the MBC.[91]

On February 20, 2015, the administrative judge in the MBC proceeding issued her second ruling, where she again found cause for discipline under each of the two alleged CBPC violations.[92] The punishment, however, was modified. Rather than revoking Dr. Harkonen's medical license, the judge ordered Dr. Harkonen to pay all past due medical license renewal fees, complete a clinical training program, and enroll in a professionalism program.[93] Dr. Harkonen paid the fees but failed to complete the training courses due to health complications that made program

---

[87] JX 561 at 20; PTO ¶ 47.

[88] JX 561 at 2.

[89] PTO ¶ 48.

[90] JX 561 at 11.

[91] *Id.* at 12.

[92] *Id.* at 5–6.

[93] *Id.* at 8–9; PTO ¶ 49.

attendance and further medical practice impractical.[94] Dr. Harkonen remains

unlicensed, and his medical license has been canceled.[95] Dr. Harkonen seeks

indemnification for $415,224.82 in legal fees he incurred from the MBC proceeding.[96]

## H. D&O Insurance Litigation

The primary D&O insurance policy, which was incorporated into both the Old

Republic and the Arch policies, provides:

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured . . . arising out of, based upon or attributable to the committing of any deliberate criminal or deliberate fraudulent act by the Insured if a judgment or final adjudication or an alternative dispute resolution proceeding adverse to the Insured(s) establishes that such deliberate criminal or deliberate fraudulent act was committed.[97]

On November 12, 2014, Old Republic demanded arbitration to recover the full

$5 million under its policy, plus pre-judgment interest.[98] InterMune and Dr.

Harkonen were co-defendants in the arbitration, and both advocated for the mutually

beneficial position that Dr. Harkonen's conduct did not fall within the fraud exception

of the insurance policy, although InterMune asserted that Dr. Harkonen would be

responsible for the payments if the arbitrations were to result in a claw-back.[99]

---

[94] Dkt. 175, Harkonen Dep. Tr. from April 12, 2023, at 69:19–70:24; PTO ¶ 50.

[95] JX 567 (Riordan Email to MBC); PTO ¶ 50.

[96] JX 656 at Overview. The fees spreadsheet allocates $413,824.82 to Riordan & Horgan and $1,400 to G. Dubcoff. *Id.*

[97] JX 657 § 4 (AIG Insurance Policy).

[98] JX 559 (Old Republic Demand for Arbitration).

[99] JX 566 (InterMune's Counterclaim).

18

On October 8, 2018, Arch filed a motion for partial summary judgment in its arbitration proceeding against Dr. Harkonen and InterMune, arguing that the advancements it paid to Dr. Harkonen under its D&O policy fell under the fraud exception.[100] Arch consequently sought to recoup the full $5 million it paid under the D&O policy, plus prejudgment interest of $4.5 million.[101] Several months later, on February 22, 2019, Old Republic filed a motion for summary judgment in its arbitration, also seeking reimbursement for the full $5 million it paid out under the D&O policy, plus prejudgment interest.[102]

On June 25, 2019, the panel in the Old Republic arbitration concluded that Old Republic was entitled to reimbursement for the "portion of the defense costs advanced by Old Republic [that] are attributable solely to defense of the wire fraud count."[103] On July 6, 2019, the Arch arbitration panel likewise concluded that Arch was entitled to reimbursement "for the fees and costs advanced that are attributable to the Wire Fraud count" and for "fees and costs [that] were incurred to defend against the allegations relating to the press release."[104]

---

[100] JX 574 at 6.

[101] *Id.* at 17.

[102] JX 576 at 28 (Old Republic Motion).

[103] JX 590 at 7.

[104] JX 591 at 8:11–16 (Arch Arbitration Ruling).

19

On September 19, 2019, InterMune and Dr. Harkonen settled Old Republic's arbitration claim.[105] The parties calculated the settlement amount by excluding Dr. Harkonen's legal expenses "incurred prior to the September 29, 2009, jury verdict" since those invoices "arguably could be said to be allocable to the defense of the misbranding count . . . ."[106] Dr. Harkonen approved and signed the Old Republic settlement agreement.[107] The Company paid the Old Republic settlement in full, subject to a reservation of rights against Dr. Harkonen.[108]

Soon thereafter, on October 31, 2019, the parties settled the Arch dispute.[109] As with the Old Republic settlement, the Arch settlement reflected the "reimbursement of defense costs solely applicable to the wire fraud claim."[110] Dr. Harkonen likewise approved and signed the Arch settlement.[111] The Company again

---

[105] PTO ¶ 43; *see* JX 593 (Brown Email Regarding Old Republic Settlement).

[106] JX 593 at 8.

[107] JX 596 at 8 (Old Republic Settlement Agreement); JX 594 (Brown Email with Old Republic Settlement Terms); Dkt. 175, Harkonen Dep. Tr. from April 14, 2023, at 20:5–17, 27:9–20.

[108] JX 596 at 4; PTO ¶ 45. Dr. Harkonen agreed to the reservation of rights provision by signing the settlement agreements. *See* JX 596 at 8; Dkt. 175, Collins Dep. Tr. from April 18, 2023, at 98:5–14 (testifying that Harkonen knowingly and specifically agreed to the reservation of rights provision).

[109] JX 600 (Arch Settlement Agreement).

[110] Dkt. 175, Brown Dep. Tr. from March 15, 2023, at 107:13–108:8.

[111] JX 600 at 9; JX 598 (Collins Email in Arch Settlement).

paid the settlement in full while preserving the right to seek reimbursement from Dr. Harkonen.[112]

## I.  Presidential Pardon

In 2020, following the settlements with the D&O insurers, Dr. Harkonen began the process of soliciting a presidential pardon.[113]  On January 19, 2021, then-President Trump granted Dr. Harkonen's pardon application (the "Pardon").[114]  Dr. Harkonen requests that the Company indemnify him for the $125,274.58 of legal expenses he incurred while seeking the Pardon.[115]  Needless to say, both parties have endured a lengthy and costly legal process due to Dr. Harkonen's wire fraud conviction.[116]

---

[112] JX 596 at 4; JX 600 at 4.

[113] JX 603 (Pardon Application).

[114] JX 606 (Presidential Pardon).

[115] JX 656 at Overview.

[116] In addition to the foregoing litigation, Dr. Harkonen brought separate actions against his defense counsel, Dr. Thomas Fleming, the DOJ, and the U.S. Department of Health and Human Services. *See Harkonen v. Topel*, S.F. Super. Ct., CGC-11-513608, Aug. 23, 2011 (Dr. Harkonen suing Topel); *Harkonen v. Fleming*, 880 F. Supp. 2d 1071 (N.D. Cal. 2012) (Dr. Harkonen suing Dr. Fleming); *Harkonen v. U.S. Dep't of Just.*, 2012 WL 6019571 (N.D. Cal. Dec. 3, 2012) (Dr. Harkonen suing the DOJ); *Harkonen v. Sebelius*, 2013 WL 5734918 (N.D. Cal. Oct. 22, 2013) (Dr. Harkonen suing the U.S. Department of Health and Human Services).  Each of the cases was eventually dismissed.  Moreover, both the Company and Dr. Harkonen have noted that there are significant legal expenses neither party is seeking to recover from the other; Dr. Harkonen claims to have incurred $2 million in legal fees for which he is not seeking indemnification and the Company claims to have advanced an additional $6 million to Dr. Harkonen for which it is not seeking indemnification.  Dkt. 168, Def.'s Opening Pre-Trial Br. ("Def.'s OB") at 2 n.2; Pls.' OB at 20 n.4.

## J.    This Litigation

The Company filed this action on August 11, 2021.[117]  On May 10, 2023, I granted partial summary judgment in favor of the Company (the "Summary Judgment Opinion"), holding that the Pardon did not render Dr. Harkonen's wire fraud litigation "successful on the merits or otherwise" for purposes of indemnification under DGCL Section 145(c).[118]  Additionally, I concluded that Dr. Harkonen, who was convicted of federal wire fraud, may not relitigate the issue of "good faith" under Section 145(a) since the guilty verdict required proving that Dr. Harkonen had acted in bad faith—and Dr. Harkonen had a full and fair opportunity to challenge the conviction through the appellate process.[119]  In the Summary Judgment Opinion, I also rejected Dr. Harkonen's defense that the Company's statements in the arbitration proceedings should be viewed as judicial admissions that invalidate its claim for repayment under DGCL Section 145.[120]

The Company now seeks repayment for the settlement amounts it paid to Arch and Old Republic for the advancements paid from the D&O policies to Dr. Harkonen for his unsuccessful defense of his wire fraud charge.  Dr. Harkonen, in turn, seeks indemnification for the legal expenses he incurred while litigating the MBC action, enforcing his advancement rights, engaging in arbitration with Arch and Old

---

[117] Dkt. 1, Verified Compl.

[118] *Harkonen IX*, 2023 WL 3337212, at *8.

[119] *Id.* at *20.

[120] *Id.* at *20–21.

22

Republic, and seeking the Pardon. A trial on the paper record was held on September 11, 2023.

## II. LEGAL ANALYSIS

The corporation, rather than the employee, bears the burden of proof in an advancement claw-back action.[121] Likewise, "in the case of a mandatory indemnification provision, the burden rests on the party from whom indemnification is sought to prove that indemnification is not required."[122] The applicable evidentiary burden in this post-trial context is proof by a preponderance of the evidence.[123] "[P]roof by a preponderance of the evidence means proof that something is more likely than not."[124]

The Bylaws provide that "the corporation shall indemnify its directors and officers to the fullest extent not prohibited by the DGCL or any other applicable law[.]"[125] "By using the phrase 'shall indemnify,' the [B]ylaw[s] not only mandate[] indemnification; [they] also effectively place[] the burden on [the Company] to demonstrate that the indemnification mandated is not required."[126] The Company

---

[121] *VonFeldt v. Stifel Fin. Corp.*, 1999 WL 413393, at *3 (Del. Ch. June 11, 1999).

[122] *Stockman v. Heartland Indus. P'rs, L.P.*, 2009 WL 2096213, at *13 (Del. Ch. July 14, 2009).

[123] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 n.112 (Del. Ch. 2007).

[124] *Narayanan v. Sutherland Glob. Hldgs. Inc.*, 2016 WL 3682617, at *8 (Del. Ch. July 5, 2016).

[125] JX 14 § 43(a).

[126] *VonFeldt*, 1999 WL 413393, at *3.

23

therefore bears the burden of proof by a preponderance of the evidence in this case, not only on its affirmative claims against Dr. Harkonen but also with respect to Dr. Harkonen's requests for indemnification against the Company.

## A.    D&O Settlement Indemnification

The Company seeks a judgment requiring Dr. Harkonen to repay to the Company the $5,906,927.02 the Company paid to Arch and Old Republic to settle the actions for repayment of the advanced sums used by Dr. Harkonen to litigate his wire fraud charge.

DGCL Section 145 governs corporate indemnification of directors and officers.[127]   "By enacting § 145, our General Assembly helped ensure that capable persons would be willing to serve as directors, officers, employees, and agents of Delaware corporations.  But those indemnification and advancement provisions are not a blank check for corporate officials."[128]  Thus, under Section 145(e), a corporation may provide advancements to its officers "upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as

---

[127] *See* 8 *Del. C.* § 145.

[128] *Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 178, 186 (Del. Ch. 2003).

authorized in this section."[129]   This ensures that "the Company's remedy for improperly advanced fees [is] recoupment at the indemnification stage."[130]

As I explained in the Summary Judgment Opinion, Dr. "Harkonen is not entitled to indemnification under Section 145(c)[,]" and Dr. "Harkonen is precluded from establishing good faith under Section 145(a) because his [wire fraud] conviction is conclusive evidence that he acted in bad faith."[131]   Dr. Harkonen is therefore ineligible to be indemnified for the advanced amounts he spent defending his wire fraud charge and appealing his conviction.

The risk of advancement repayment was always a known possibility.   The Bylaws and the Indemnity Agreement both require that InterMune indemnify Dr. Harkonen only "to the fullest extent not prohibited by the DGCL."[132]   And the Bylaws and the Indemnity Agreement expressly state that Dr. Harkonen must repay the advanced amounts if it is "determined ultimately that [he] is not entitled to be indemnified under" the DGCL.[133]   Indeed, the Undertaking confirmed Dr. Harkonen's obligation to repay advanced sums "if it shall be determined ultimately that [he is]

---

[129] 8 *Del. C.* § 145(e); *see also Marino v. Patriot Rail Co.*, 131 A.3d 325, 336–37 (Del. Ch. 2016).

[130] *Mooney v. Echo Therapeutics, Inc.*, 2015 WL 3413272, at *6 (Del. Ch. May 28, 2015) (citing *Holley v. Nipro Diagnostics, Inc.*, 2014 WL 7336411, at *13–14 (Del. Ch. Dec. 23, 2014)).

[131] *Harkonen IX*, 2023 WL 3337212, at *8, *13 (explaining why Dr. Harkonen is barred from recovering under both Sections 145(a) and 145(c)).   The Pardon does not change this outcome.   Dr. "Harkonen remains unsuccessful, pardoned or not." *Id.* at *10.

[132] JX 14 § 43(a); JX 15 § 8.

[133] JX 14 § 43(c); JX 15 § 8.

25

not entitled to be indemnified under the provision of the Indemnity Agreement, the [Bylaws], Delaware General Corporate Law, or otherwise."[134]

The record confirms that both settlements reflect only the amounts attributable to the wire fraud count and the subsequent interest thereon.[135] The arbitrations leading to the settlements each concluded that the D&O insurers—Arch and Old Republic—were entitled to recover the amounts attributable to the wire fraud defense and appeals.[136] Dr. Harkonen's former attorney even testified that the settlement amounts were based on the arbitration panels' "interlocutory award that said that [the insurers] were going to be able to recover fees allocable to the . . . wire fraud conviction."[137] Dr. Harkonen must therefore repay the Company for the $5,906,927.02 it paid to settle the insurance disputes arising from Arch and Old Republic's payments to him to litigate his wire fraud charge.

---

[134] JX 476.

[135] *See, e.g.*, JX 593 at 8–9; JX 596; Dkt. 175, Brown Dep. Tr. from March 15, 2023, at 100:5–11 (explaining that counsel for Old Republic calculated the final settlement figure by "figur[ing] out how much of the defense costs" were "clearly applicable to the wire fraud claim," in order to "pay his client back for that amount plus interest"); *id.* at 106:21–107:1 (explaining that InterMune "accepted [Old Republic's] proposal and did a deal that called for a payment back, again, to the penny, for the costs incurred for the wire fraud count"); JX 600 at 3; *see also* JX 597 at 3–4 (Brown Email to InterMune) (explaining that the Old Republic settlement approach "inform[ed]" InterMune's approach to the Arch settlement); Dkt. 175, Brown Dep. Tr. from March 15, 2023, at 107:13–108:8 (explaining that, like the Old Republic settlement, the Arch settlement represented a "buyout of what [Brown] thought was [Arch's] only remaining claim, which was reimbursement of defense costs solely applicable to the wire fraud claim").

[136] *See* JX 590; JX 591.

[137] Dkt. 175, Collins Dep. Tr. from April 18, 2023, at 99:11–13.

Dr. Harkonen was convicted of felony wire fraud. Accordingly, Dr. Harkonen was found to have acted in bad faith. Despite numerous opportunities on appeal to overturn the conviction, his conviction was repeatedly and conclusively affirmed. Dr. Harkonen is therefore not entitled to indemnification for his defense of that wire fraud conviction under DGCL Section 145.[138]

## B. Dr. Harkonen's Unsuccessful Defenses

Dr. Harkonen raises several defenses, attempting to prevent this conclusion. Dr. Harkonen argues that (1) the Company waived and released all claims under the Mutual Release, (2) the Company is barred by hold harmless provisions in the Indemnity Agreement and the Mutual Release, (3) the settlement payment was voluntary, (4) the Company's claims are time-barred, (5) the Company is barred by the unclean hands doctrine, and (6) the settlements themselves are not advancement fees. I discuss each defense in turn.

### 1. The Mutual Release

Dr. Harkonen argues that InterMune waived and released its claims against him via the Mutual Release in 2003. InterMune counters that, among other things, Dr. Harkonen waived this defense by waiting until pre-trial briefing to raise it.

---

[138] The Company also asserts that it may recover the settlement amounts from Dr. Harkonen because it reserved the right to hold Dr. Harkonen responsible in the settlement agreements themselves. Both settlement agreements provided that the settlements would "not limit or otherwise compromise any rights or obligations that InterMune and/or Harkonen have or may have vis-à-vis one another, including . . . [the] ultimate responsibility at law, in equity, or otherwise for the [s]ettlement [a]mount[.]" JX 596 at 4; JX 600 at 4.

"Court of Chancery Rule 8(c) requires a defendant responding to a complaint to set forth 'any . . . matter constituting an avoidance or affirmative defense.'"[139] "Generally, an affirmative defense must be pled or the defense is waived."[140] In the interests of both fairness and efficiency, parties are expected to assert defenses "early and loudly."[141] In deciding whether to allow a late defense, courts consider whether failure to raise the defense sooner "caused prejudice to a party without notice of the defense by making it difficult, if not impossible, to fairly face the issue for the first time during trial."[142]

Nowhere in Dr. Harkonen's affirmative defenses did he assert the Mutual Release as a defense to InterMune's claims. Dr. Harkonen raised eleven affirmative defenses in his answer to the Complaint (the "Answer"), spanning nearly thirty pages.[143] Yet none of them can be fairly read to give notice of this Mutual Release defense. The closest of the eleven merely asserts that InterMune's claims are "Barred

---

[139] *In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.*, 2002 WL 31926614, at *2 (Del. Ch. Dec. 16, 2002) (alteration in original).

[140] *James v. Glazer*, 570 A.2d 1150, 1153 (Del. 1990) (citations omitted); *see also Anderson v. Hill*, 2020 WL 2128738, at *5 n.35 (Del. Ch. May 5, 2020) ("[T]he failure to raise an affirmative defense may constitute a waiver, if that defense is not raised in a timely fashion.").

[141] *In re Nantucket Island Assocs.*, 2002 WL 31926614, at *4.

[142] *Alexander v. Cahill*, 829 A.2d 117, 128–29 (Del. 2003). Then-Vice Chancellor Strine ruled on at least two occasions that defenses raised in the final months before trial were barred due to the prejudicial nature of changing arguments after the other side had conducted discovery and created a litigation strategy based on the pled claims and defenses. *See In re Nantucket Island Assocs.*, 2002 WL 31926614, at *3; *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *22 n.117 (Del. Ch. Aug. 18, 2006).

[143] *See* Dkt. 52, Answer to the Verified Compl. ("Answer") at 40–69.

by Controlling Documents and Law."[144]  But even if I were to ignore the extraordinarily vague nature of that phrase, the explanatory paragraph mentions several documents on which the defense is founded, and the Mutual Release is notably absent.  And when confronted with this point in the briefing and at trial, Dr. Harkonen did not identify anything that would have put the Company on notice of this defense until shortly before trial.

The Company asserts that this late defense is prejudicial.  The Company raises specific examples of information it would have requested in discovery, had it been put on notice of the Mutual Release defense now raised by Dr. Harkonen.[145]  The Company suggests this prejudice is even more severe here since Dr. Harkonen raised the defense shortly before a trial on the paper record, meaning there would be no live cross-examination of Dr. Harkonen about the Mutual Release at trial.[146]  I agree with the Company—defenses should not be raised on the eve of trial.  Dr. Harkonen's failure to raise his Mutual Release defense before the pre-trial briefs, let alone "early and loudly," means the defense is waived.

But even if I were to consider the Mutual Release defense, Dr. Harkonen subsequently signed and delivered the Undertaking to the Company.[147]  Both the

---

[144] *Id.* at 42.

[145] *See* Dkt. 160, Pls.' Answering Pre-Trial Br. at 17–18.

[146] *Id.* at 18.

[147] At trial, Dr. Harkonen's counsel astonishingly argued that the Undertaking is "a worthless document" that "has no legal effect[.]"  TT 109:8–9, 21–22.  Dr. Harkonen's counsel also surprisingly argued that this Court should not consider the December 2008 Letter

December 2008 Letter demanding advancement and the Undertaking that the letter references cite the Indemnity Agreement and Dr. Harkonen's obligation to repay advanced amounts if it is determined that Dr. Harkonen is not entitled to be indemnified.[148] If there was any doubt whether the Mutual Release covered Dr. Harkonen's obligation to repay future advanced sums arising out of future litigation, Dr. Harkonen's subsequent signing and delivery of the Undertaking in 2008 confirms that, before this litigation, Dr. Harkonen believed it did not.[149] In addition, Dr. Harkonen's Mutual Release defense presumes that the Company could choose to ignore Section 145's limitations on indemnification for bad faith conduct. Dr. Harkonen fails to explain how this squares with the statute.[150]

---

demanding advancement and specifically referencing the Undertaking. TT 106:12–15. Regardless of what Dr. Harkonen may argue now, the December 2008 Letter makes plain the broad scope he intended the Undertaking to be given when he was demanding the Company open its checkbook. *See* JX 477.

[148] JX 477 (referencing Dr. Harkonen's obligation "to repay said amounts if it shall be determined that [Dr. Harkonen] is not entitled to be indemnified under the provisions of this Agreement, the By-Laws, the Code or otherwise" (quoting JX 15 § 8)); JX 476 (referencing Dr. Harkonen's obligation to repay "if it shall be determined that [he is] not entitled to be indemnified under the provisions of the Indemnity Agreement, the By-Laws of InterMune, Delaware General Corporation Law, or otherwise").

[149] *See Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189 (Cal. Ct. App. 1987) ("The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intention.").

[150] In addition, as highlighted by the Company during trial, "all contracts for advancement and indemnification are subject to an implied reasonableness term." *Reddy v. Elec. Data Sys. Corp.*, 2002 WL 1358761, at \*5 (Del. Ch. June 18, 2002) (citing *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 823 (Del. 1992)).

In sum, the Mutual Release defense was waived. But even if I were to consider it, the releases found in the Mutual Release do not reach the Company's claims against Dr. Harkonen in this action.

## 2. Hold Harmless Provisions

Dr. Harkonen next argues that the hold harmless provisions in the Mutual Release and the Indemnity Agreement bar the Company from recovery.[151] But this defense, like the Mutual Release defense, was raised for the first time in the pre-trial briefings, which was too late for InterMune to focus its discovery on the hold harmless provisions of the two agreements.

The only pled affirmative defense that could potentially be construed to give InterMune notice of this defense is, again, the vague sixth affirmative defense: "Barred by Controlling Documents and Law." But even this defense, although it notes that "InterMune's claim is barred by its Indemni[ty] Agreement" is unrelated to the hold harmless provisions.[152] A full reading of the affirmative defense confirms that that it is limited to the context of the Pardon, not as it relates to the provisions of the Indemnity Agreement.[153] And, as noted previously, the Mutual Release is absent from the defenses entirely. So, for the same reasons the Mutual Release defense was waived, the hold harmless provisions defense is also waived.

---

[151] JX 15 § 2; JX 361 § 5.

[152] Answer at 42.

[153] *Id.*

But, again, even if I were to consider this defense, it would fail for the same reasons the Mutual Release defense fails. As mentioned above, Dr. Harkonen's subsequent Undertaking confirms Dr. Harkonen's obligation to "repay said amounts advanced[.]"[154] And, importantly, this argument too is premised on the notion that the Company could ignore the bad faith limitations of Section 145.

Thus, Dr. Harkonen waived the hold harmless provisions defense. But even if I were to consider the untimely defense, it fails for the additional reasons described above.

### 3. Voluntary Payment

Dr. Harkonen next suggested that InterMune's payments to settle the D&O insurance claims were voluntary payments that cannot be recovered. The Company devoted not insignificant portions of its briefing to rebutting this defense. And Dr. Harkonen ultimately withdrew the defense of voluntary payment at trial.[155]

### 4. Time-Barred

Next, Dr. Harkonen suggests that InterMune's claims are time-barred.[156] The Company again asserts that the defense is raised too late in the litigation process.

Dr. Harkonen's second affirmative defense in the Answer asserted "InterMune's claim is barred, in whole or in part, on the equitable principle of

---

[154] JX 476.

[155] TT 74:1–2.

[156] Def.'s OB at 18.

Laches[.]"[157]  Yet timeliness has hardly been the center of Dr. Harkonen's defense arguments, and there is a strong argument that the statute of limitations defense under 10 *Del. C.* § 8106 does not fall within the laches affirmative defense identified by Dr. Harkonen in the Answer.  But I recognize that the Company was on notice that Dr. Harkonen could raise a timeliness defense and therefore address this defense on its merits.

"[B]ecause indemnification is a right conferred by contract, under statutory auspice, actions seeking indemnification are subject to the three-year limitations period . . . ."[158]  A claim for indemnification or for repayment of advancement due to a lack of entitlement to indemnification are mirror images of each other.  They accrue at the same stage and are subject to the same three-year limitations period.

"Delaware courts decline to exercise jurisdiction over a case unless the underlying controversy is ripe, *i.e.*, has 'matured to a point where judicial action is appropriate.'"[159]  "[N]umerous decisions of our Court of Chancery have consistently held that an indemnity claim does not accrue until the underlying action is resolved."[160]  Thus, a claim for indemnification "only becomes ripe once the

---

[157] Answer at 40.

[158] *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 559 (Del. 2002); *see also* 10 *Del. C.* § 106(a).

[159] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (quoting *Stroud v. Milliken Enters., Inc.*, 522 A.2d 476, 480 (Del. 1989)).

[160] *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1280 n.36 (Del. 2016) (collecting DGCL Section 145 precedent).

underlying proceeding is truly final."[161] This is, in part, to "reduce the chance that the court will engage in a wasteful exercise in predictive justice, only to see its work undone by a reversal of the trial court's judgment in the underlying matter."[162] Since repayment claims depend on a party's rights to indemnification, repayment claims in indemnification cases likewise only become ripe when the underlying action is resolved.

The claim for repayment became ripe at the earliest on November 5, 2018, when Dr. Harkonen exhausted his final appeal upon the U.S. Supreme Court denying his petition for writ of certiorari[163] or, at the latest, in 2019 when the settlement liabilities were incurred. InterMune filed its Complaint on August 11, 2021, well within the three-year window under either alternative.

Dr. Harkonen's time-bar defense therefore fails.

### 5. Unclean Hands

The unclean hands defense is the only defense that both the Company and Dr. Harkonen agree was properly raised at the pleading stage. Yet, although properly raised, it is inapplicable.

---

[161] *Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 397 (Del. Ch. 2008).

[162] *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *9 (Del. Ch. Oct. 19, 2000).

[163] But I question whether InterMune could have brought the claims in 2018, prior to the D&O settlements. The Undertaking limited the Company to recovering only "expenses [that] are not paid by insurance." JX 476. Indeed, incurring the expense is a logical prerequisite to the request for repayment. And the Company did not make the repayment request until the Company settled with Arch and Old Republic in 2019 once the Company ultimately incurred the expense. But even if the claims began to accrue once Dr. Harkonen exhausted his appellate reviews, the claims would still be within the statute of limitations.

"The doctrine of unclean hands is '[e]quity's maxim that a suitor who engaged in his own reprehensible conduct in the course of [a] transaction at issue must be denied equitable relief . . . , a rule which in conventional formulation operated *in limine* to bar the suitor from invoking the aid of the equity court . . . .'"[164] "The Court of Chancery has broad discretion in determining whether to apply the doctrine of unclean hands."[165] "The question of unclean hands is factual . . . ."[166] But, although the question of whether unclean hands applies is factual, under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."[167]

Much of Dr. Harkonen's unclean hands defense is an improper attempt to relitigate his original wire fraud conviction and his relevant state of mind. Indeed, Dr. Harkonen's affirmative defense of unclean hands spans almost twenty pages of the Answer, and much of the substance mirrors the arguments he made in his prior cases.[168] Consistent with the doctrine of collateral estoppel, I refuse to reconsider

---

[164] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 875–76 (Del. 2015) (alteration in original) (quoting *McKennon v. Nashville Banner Publ'g. Co.*, 513 U.S. 352, 360 (1995)).

[165] *SmithKline Beecham Pharms. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 448 (Del. 2000) (citing *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998) ("[T]he decisional authority is almost universal in its acceptance that courts of equity have extraordinarily broad discretion in application of the doctrine [of unclean hands]." (citations omitted))).

[166] *Collins v. Burke*, 418 A.2d 999, 1004 (Del. 1980).

[167] *Hercules Inc. v. AIU Ins. Co.*, 783 A.2d 1275, 1278 (Del. 2000).

[168] *See* Answer at 42–68.

whether Dr. Harkonen was properly convicted of wire fraud. Numerous judges have already reviewed the matter, and all have determined the same thing—Dr. Harkonen remains guilty of wire fraud.

As InterMune points out, however, although Dr. Harkonen's defense of unclean hands may have started as an attempt to relitigate his conviction, it has evolved over the life of this case.[169] Indeed, Dr. Harkonen's original unclean hands defense asserted in his affirmative defenses involved InterMune's actions that "irreparably harmed Dr. Harkonen's reputation and ability to . . . properly defend himself at his criminal trial and in subsequent actions by the U.S. government."[170] This theory more or less continued into Dr. Harkonen's pre-trial opening brief where he asserted that InterMune's "misrepresentations led to Dr. Harkonen's underserved criminal record and the loss of his brilliant career."[171] Yet, now, Dr. Harkonen asserts that this Court should accept his unclean hands defense because InterMune's "20-year pattern of adopting irreconcilable positions depending on which way direction the wind blew should prevent [the Company's] recovery on [its] claims in this equitable action."[172]

Dr. Harkonen attempts to walk a fine line in making his most recent unclean hands argument because, as I explained in the Summary Judgment Opinion, "[t]he

---

[169] TT 47:21–49:5.

[170] Answer at 57–58.

[171] Def.'s OB at 32.

[172] Dkt. 169, Def.'s Answering Pre-Trial Br. ("Def.'s AB") at 16.

legal theories of the Company's arbitration counsel [were] not judicial admissions"[173] and do not provide an avenue for Dr. Harkonen to "disguise the wolf of indemnification for a willful violation of positive law in the sheep's clothing of a judicial admission."[174] Indeed, to accept Dr. Harkonen's position "would enable corporations to indemnify conduct that Section 145 has deemed non-indemnifiable."[175] That is neither our law nor in line with the equitable principles upon which Dr. Harkonen professes to call.

None of this should detract from the fact that Dr. Harkonen was convicted based on *his* actions. It does not matter, for purposes of this analysis, how strongly Dr. Harkonen now believes he should not have been convicted, or even if he may otherwise be an upstanding citizen.

This has been fought up and down. Dr. Harkonen has had ample opportunity to fight his conviction, and much of that fight was done on the Company's dime. The Company's efforts to win the insurance arbitrations, or at least minimize any award, are not unclean hands. If they were, companies would be confronted with conflicting and strange incentives.

Dr. Harkonen voluntarily accepted and enjoyed the full benefit of advancement to defend himself in the federal wire fraud litigation. But these advancements were subject to an undertaking in which he acknowledged and committed to satisfy his

---

[173] *Harkonen IX*, 2023 WL 3337212, at *21.

[174] *Id.* at *22.

[175] *Id.* at *20.

repayment obligations under the Indemnity Agreement and the DGCL. Even if in seeking to minimize any arbitration award the Company took positions in the insurance arbitrations that were advantageous to Dr. Harkonen, that does not eliminate Dr. Harkonen's obligation to repay the advancements under the Undertaking and DGCL Section 145's limitations on indemnification for actions taken in bad faith.

Dr. Harkonen's unclean hands defense is therefore inapplicable in this case.

### 6. Scope of the Undertaking

Dr. Harkonen's final defense is that only a portion of the settlement amounts constitute "fees" within the scope of the Undertaking.

Dr. Harkonen raised this final defense for the first time *at trial*.[176] I asked counsel whether this defense had been briefed,[177] and counsel responded that she would confirm.[178] I did not receive a response to my question at trial. In light of this defense and other new arguments made by Dr. Harkonen at trial, I requested that the parties submit letters to this Court identifying arguments presented at trial that had not been briefed.

The Company filed its letter first, noting that Dr. Harkonen asserted this defense, along with several other arguments, for the first time at trial.[179] Dr.

---

[176] TT 102:21–103:5.

[177] *Id.* 103:18–23.

[178] *Id.* 104:4–6.

[179] *See* Dkt. 185, Def.'s Post-Trial Letter.

Harkonen then filed his letter and confirmed that this defense was indeed made for the first time at trial, but that the Court should nonetheless consider it.[180] Dr. Harkonen then dedicated a significant portion of his letter to arguing his newest defense.

"It is difficult to address th[is] theor[y] because [Dr. Harkonen] only mentioned [it] briefly, did not develop the arguments, and did not provide any supporting [legal] authority other than bare citations to provisions of the [Undertaking]. A court need not address arguments that are presented in such a cursory and elliptical manner."[181] Indeed, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."[182] By mentioning the defense for the first time in passing at the trial on a paper record, the defense is waived. The analysis ends there.

But even if I were to consider the defense, it would not change the outcome. InterMune and Dr. Harkonen spent many months in the arbitrations working to minimize the amount the Company and, thus, Dr. Harkonen would need to repay to the D&O insurers. Not only did InterMune take lead in negotiating to minimize the settlement payment, but InterMune also agreed to pay the amount in full in the first

---

[180] Notably, this was not the only argument raised by Dr. Harkonen for the first time at trial. *See* Dkt. 184, Pls.' Post-Trial Letter.

[181] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *78 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

[182] *Roca v. E.I. du Pont de Nemours & Co.*, 842 A.2d 1238, 1242 n.12 (Del. 2004) (internal quotation marks and citations omitted).

instance, while reserving its right ultimately to hold Dr. Harkonen responsible for the settlement amount.

The record confirms the general calculations of the settlements, and they were not a hodge podge of concessions, as suggested by Dr. Harkonen in his supplemental letter. The settlement amounts instead reflected an approximation of the advancements used to litigate the wire fraud charge plus interest. In the Old Republic settlement, for example, InterMune's counsel noted that settlement discussions were less of a compromise and more of "an application of the principles laid out" in the Old Republic arbitration panel's ruling.[183] And, in both arbitrations, the settlements reflected only the amounts Dr. Harkonen used to litigate his wire fraud charge and conviction.[184]

Let us also not forget that Dr. Harkonen had a seat at the table for both settlements. Dr. Harkonen approved and signed the settlements, which included InterMune's reservation of rights to hold Dr. Harkonen ultimately responsible for the settlement amounts.

There is little doubt that these settlements reflected the advancement amount Dr. Harkonen used for the wire fraud litigation, which was both non-indemnifiable and not covered by the D&O insurance policies. The untimely nature of Dr. Harkonen's defense is further evidence of that understanding; no one questioned

---

[183] JX 592 at 2 (Brown Letter for Old Republic Settlement).

[184] JX 593 (describing the Old Republic settlement amount); Dkt. 175, Brown Dep. Tr. from March 15, 2023, at 107:13–108:8 (describing the Arch settlement amount).

40

whether the settlements approximated the amounts for which Dr. Harkonen was required to repay until I asked at trial whether that argument had been made in the briefing, and counsel seized the opportunity to make the late argument in a post-trial letter to the Court. This defense thus fails.

### 7. Conclusion

Dr. Harkonen must repay the Company the $5,906,927.02 it seeks in this action as repayment of advanced sums for which Dr. Harkonen is not entitled to indemnification. The advancements were not foisted upon Dr. Harkonen; he voluntarily demanded their payment and gave the Undertaking. Dr. Harkonen then accepted and enjoyed the full benefit of very substantial advancements of attorneys' fees, conditioned only on an obligation to repay if he were ultimately ineligible for indemnification. Given that Dr. Harkonen is ineligible for indemnification, he now has the obligation to repay the advanced amounts he received to litigate his wire fraud charge.

## C. Dr. Harkonen's Requests for Indemnification

Dr. Harkonen requests indemnification "under 8 *Del. C.* § 145(c)" for expenses incurred in (1) litigating the MBC action, (2) seeking advancements from the Company, (3) litigating the D&O insurance arbitrations, and (4) seeking the Pardon.[185]

Before I address Dr. Harkonen's "counterclaims," I note that, in yet another strange twist in this case, they were never pled. Not a single counterclaim is raised

---

[185] Def.'s OB at 41.

41

in Dr. Harkonen's Answer.[186] That alone is fatal to the counterclaims' viability. But, at trial, counsel for the Company stated that although Dr. Harkonen never formally pled his "counterclaims" for indemnification, the Company nonetheless asks me "to resolve as many of the open issues between these parties as possible[.]"[187]

Given the parties' mutual desire for an adjudication of Dr. Harkonen's "counterclaims," I will, with great reluctance, consider them. Ultimately, however, in addition to being procedurally improper, Dr. Harkonen's indemnification counterclaims are unsuccessful.

### 1. Medical Board of California

Dr. Harkonen argues that, under Section 145(c), the Company must indemnify him for the $415,224.82 he incurred while litigating in his MBC disciplinary proceeding. The claim, however, is untimely. In addition, Dr. Harkonen was not "successful" in the proceeding.

As discussed above, indemnification claims must be brought within three years after the underlying action is resolved. It is difficult to see how the MBC proceeding was not an independent proceeding before a medical licensing and disciplinary board. Because the MBC proceedings concluded in 2015, nearly a decade ago, any indemnification claim Dr. Harkonen might have once had relating to the proceeding

---

[186] At oral argument on September 15, 2022, Dr. Harkonen's counsel observed that "[t]his is not a case where Dr. Harkonen is seeking indemnification of the money he paid out of pocket." Dkt. 48, Tr. for September 15, 2022, Hr'g at 9:4–5. That continued to be the case on September 30, 2022, when Dr. Harkonen filed his Answer without asserting a single counterclaim. *See* Answer at 40.

[187] TT 134:19–20.

accrued then too. Dr. Harkonen thus asserts his "counterclaim" long after the three-year limitations period ran.

But, even if I were to look past this, Dr. Harkonen was unsuccessful in his MBC litigation and therefore does not qualify for indemnification under DGCL Section 145(c). In determining whether a party is "successful" under Section 145(c), the party "need only prevail—in a strictly legal sense—in terms of the outcome of the proceeding."[188] And, as this Court has recognized, an individual may be unsuccessful in the legal sense, even when a settlement does not require a monetary payment or admission of liability.[189]

"[I]n a strictly legal sense," Dr. Harkonen was unsuccessful in his MBC proceedings because in both proceedings the administrative judge ruled that "cause for license discipline exists[.]"[190] Dr. Harkonen nonetheless maintains that this litigation was a success because "he achieved the result he sought."[191] But the administrative judge ultimately ruled against Dr. Harkonen, finding cause for discipline under each of the two alleged CBPC violations—albeit imposing a lesser punishment than that issued in the original ruling. Lessening a punishment, however, is not a "success" under Section 145(c) for the same reason that Dr.

---

[188] *Evans v. Avande, Inc.*, 2021 WL 4344020, at *4 (Del. Ch. Sept. 23, 2021) (citing *Hermelin v. K-V Pharm. Co.*, 54 A.3d 1093, 1107 (Del. Ch. 2012)).

[189] *See, e.g.*, *Huret v. MondoBrain, Inc.*, 2022 WL 1232582 (Del. Ch. Apr. 27, 2022).

[190] JX 560 at 7 (MBC's Decision After Non-Adoption).

[191] Def.'s AB at 41.

Harkonen's wire fraud conviction was not a success under Section 145(c) despite the penalty ultimately imposed being substantially less than the maximum or requested sentence pursued by federal prosecutors.

Dr. Harkonen therefore is not entitled to indemnification for the costs incurred in the MBC proceeding because the claim is both untimely and he was unsuccessful in the respective proceeding.

## 2. Advancement Rights

Dr. Harkonen next argues that the Company must indemnify him for the $90,132.83 he incurred in enforcing his advancement rights. But, as the Company properly points out, this "counterclaim" is also brought too late.

Fees on fees claims are claims for indemnification.[192] As discussed above, indemnification claims must be brought within three years under the statute of limitations.[193] The Bylaws and the Indemnity Agreement both grant Dr. Harkonen the right to recover fees incurred while enforcing his right to advancements.[194] But Dr. Harkonen's claim accrued on December 13, 2011, when Dr. Harkonen and InterMune entered into the 2011 Settlement Agreement. Yet Dr. Harkonen asserted

---

[192] *See Fasciana*, 829 A.2d at 183–84.

[193] *See also* 10 *Del. C.* § 8106(a).

[194] JX 14 § 43(d).

this fees-on-fees "claim" over a decade after the 2011 Settlement Agreement. This claim, like the MBC indemnification claim, is therefore untimely.[195]

### 3.    Insurance Arbitrations

Next, Dr. Harkonen asserts that the Company must indemnify him for the legal expenses he incurred during the insurance arbitration which amounts to $201,238.18 in the Old Republic arbitration and $326,368.36 in the Arch arbitration.

Even setting aside Dr. Harkonen's failure to plead this (or any) counterclaim, Dr. Harkonen was not "successful" in the insurance arbitrations such that Section 145(c) mandates indemnification. The arbitrators in both arbitrations ruled that the amounts associated with defending Dr. Harkonen's wire fraud charge fell under the policies' exclusion for claims "attributable to the committing of any deliberate criminal or deliberate fraudulent act[.]"[196] The D&O insurers were therefore entitled to recoupment for the defense costs incurred on behalf of Dr. Harkonen in litigating the wire fraud charge. The parties then settled, with the Company paying the settlement amounts in the first instance, but reserving, with Dr. Harkonen's express agreement, its right to hold Dr. Harkonen ultimately responsible, which the Company then exercised via this action.

This conclusion is further confirmed in light of my ruling that Dr. Harkonen is responsible for the full settlement amounts. If anything, the Company accorded Dr.

---

[195] The Company makes several other arguments, including waiver and the reasonableness of the underlying fees. I need not reach these given my analysis above.

[196] JX 657 § 4(c).

45

Harkonen a benefit by paying the amounts required to resolve arbitration with the insurers. It would be strange to say that, in doing so, the Company placed itself on the hook for Dr. Harkonen's very substantial attorneys' fees in participating in an arbitration that squarely rejected the arguments against liability and that resulted in cash outflows that he must now repay in full. So, although Dr. Harkonen delayed his payment of the liability, he cannot assert that he successfully "avoided an adverse result."[197]

Additionally, even if I were to consider Dr. Harkonen as eligible for indemnification in litigating a claim caused by his bad faith actions, he expressly agreed, in both the Old Republic settlement and the Arch settlement, to bear his "own respective costs and fees" incurred during the arbitrations.[198]

Dr. Harkonen, therefore, cannot look to the Company for indemnification for the legal expenses he incurred participating in the arbitrations with Arch and Old Republic.

### 4. Presidential Pardon

Lastly, Dr. Harkonen demands that the Company indemnify him for the $125,274.58 he incurred in seeking the Pardon.

---

[197] *Hermelin v. K-V Pharm. Co.*, 54 A.3d 1093, 1107 (Del. Ch. 2012). Alternatively, one might conceive that the bad faith determination itself vitiated Dr. Harkonen's right to indemnification. *See Evans*, 2021 WL 4344020, at *6 (commenting that a director "adjudged to have acted in bad faith . . . can hardly assert that he is entitled to indemnification for a claim where that integrity was found lacking").

[198] *See* JX 600 at 5; JX 596 at 4.

46

Dr. Harkonen's framing of the Pardon, like his counterclaims and defenses, has changed over the course of this litigation. Prior to the Summary Judgment Opinion, Dr. Harkonen framed the Pardon as the ultimate successful defense of his wire fraud conviction, thereby absolving him of his duty to repay the advanced amount used to defend the wire fraud charge. In the Summary Judgment Opinion, however, I noted that under Section 145(c)—the only provision under which Dr. Harkonen seeks indemnification here—indemnification is only available for directors and officers who have "been successful on the merits or otherwise in defense of any action, suit or proceeding[.]"[199] The Pardon, however, like most pardons, "does not erase or expunge the record of conviction and does not indicate innocence."[200] Therefore, as I explained in the Summary Judgment Opinion, the Pardon does not constitute success for his wire fraud proceeding under Section 145(c).[201] So even viewing the Pardon as part of the criminal wire fraud proceeding,[202] Dr. Harkonen was therefore unsuccessful in his wire fraud defense.

Having found no luck when considering the Pardon as an extension of the underlying wire fraud proceeding, Dr. Harkonen now asks me to consider the Pardon as its own proceeding. Dr. Harkonen tries to strike an awkward balance by stating

---

[199] *Harkonen IX*, 2023 WL 3337212, at *8 (quoting 8 *Del. C.* § 145(c)(1)).

[200] JX 606; *see also Harkonen IX*, 2023 WL 3337212, at *10–13.

[201] *Harkonen IX*, 2023 WL 3337212, at *10–13.

[202] Although in issuing the Summary Judgment Opinion I questioned whether the Pardon should be considered as part of the wire fraud proceeding. *See id.* at *9 n.62.

that the Pardon was both in defense of his criminal charges and separate from the criminal proceeding itself.[203] And although related to the criminal wire fraud, Dr. Harkonen further suggests the Pardon was a separate "effort to restore his reputation."[204]

But even assuming the Pardon constitutes its own proceeding, Section 145 requires that the expenses be incurred "in defense of" that proceeding.[205] And although this Court "adopt[s] a broad reading of the phrase 'in defense[,]'"[206] that broad reading has its limits.[207]

Here, Dr. Harkonen received the Pardon in January 2021, a decade after his wire fraud conviction and years after his underlying wire fraud conviction became final and non-appealable. The Pardon, when separated from the criminal wire fraud proceeding, cannot be viewed as "in defense of" a proceeding, even when allegedly pursued to vindicate one's perceived reputation. As this Court has held in prior decisions, there are distinctions to be drawn between defensive actions taken by directors and officers in litigation related to their service, and affirmatively filed suits initiated by directors and officers.[208] In this instance, even assuming the Pardon

---

[203] *See* Def.'s OB 53–59.

[204] *Id.* at 56.

[205] 8 *Del. C.* § 145(c).

[206] *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 824 (Del. 1992).

[207] *See generally Baker v. Impact Hldg., Inc.*, 2010 WL 2979050 (Del. Ch. July 30, 2010).

[208] *Id.* at *7–9.

process might be deemed a separate "proceeding" as Dr. Harkonen advocates, his obtaining the Pardon was not "in defense of" that proceeding. And, to the extent Dr. Harkonen argues the Pardon was "in defense of" the underlying felony wire fraud proceeding, the Summary Judgment Opinion explains at length why that argument must be rejected. Dr. Harkonen therefore is not entitled to indemnification under DGCL Section 145(c).

## D. Fees on Fees

Dr. Harkonen also requests an award of fees on fees for this action. Given that Dr. Harkonen did not prevail on any claim, Dr. Harkonen is not entitled to fees on fees.

* * *

The only remaining questions relate to interest. Although the Company devoted a significant portion of its briefing to interest questions, that briefing was directed to arguments concerning any potential award of interest in Dr. Harkonen's favor. And, for his part, Dr. Harkonen did not address an interest award to the Company at all. "In Delaware, prejudgment interest is awarded as a matter of right."[209] And, "[a]s a general rule, interest accumulates from the date payment was due to the plaintiff[.]"[210] "Prejudgment interest accrues at the legal rate set forth in

---

[209] *Pontone v. Milso Indus. Corp.*, 100 A.3d 1023, 1058 (Del. Ch. 2014) (quoting *Roven*, 603 A.2d at 826).

[210] *Moskowitz v. Mayor of Wilmington*, 391 A.2d 209, 210 (Del. 1978).

6 *Del. C.* § 2301(a) and is compounded quarterly."[211]  "Under Delaware law, where neither party submits evidence showing the appropriate rate of interest, the court typically awards 5% over the Federal Reserve discount rate compounded quarterly."[212]

Accordingly, InterMune is entitled to pre-judgment interest at the legal rate provided in 6 *Del. C.* § 2301(a), compounded quarterly.

### III.  CONCLUSION

For the foregoing reasons, InterMune is entitled to recover the $5,906,927.02 it paid to settle the D&O insurance claims; Dr. Harkonen is ultimately responsible for those legal expenses incurred in litigating his wire fraud conviction.  Additionally, Dr. Harkonen's unpled counterclaims for indemnification each fail.  The parties are directed to confer and provide a form of order implementing this decision.

---

[211] *Creel v. Ecolab, Inc.*, 2018 WL 5733382, at *10 (Del. Ch. Oct. 31, 2018).

[212] *Sweeney v. Sweeney*, 2024 WL 3040424, at *14 n.172 (Del. Ch. June 18, 2024). Additionally, "Delaware courts routinely grant post-judgment interest in advancement cases." *Underbrink v. Warrior Energy Servs. Corp.*, 2008 WL 2262316, at *19 (Del. Ch. May 30, 2008).  So, I further grant InterMune "post-judgment interest on the full amount of the judgment, including that part comprised of pre-judgment interest, compounded quarterly at the legal rate under 6 *Del. C.* § 2301(a)." *Id.* (footnote omitted) (citing *Brandin v. Gottlieb*, 2000 WL 1005954 (Del. Ch. July 13, 2000)).